## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## NEW HAVEN DIVISION

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| CURTIS JAMES JACKSON, III | : | |
| *Debtor* | : | CASE NO.: 15-21233 (AMN) |
| | : | |
| CURTIS JAMES JACKSON, III | : | Adv. Proc. No. 17-2068 (AMN) |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| GSO BUSINESS MANAGEMENT, LLC, | : | |
| JONATHAN SCHWARTZ, MICHAEL | : | |
| OPPENHEIM, BERNARD GUDVI, | : | |
| NICHOLAS BROWN, and | : | |
| WILLIAM BRAUNSTEIN | : | |
| *Defendants* | : | |
| | : | |
| GSO BUSINESS MANAGEMENT, LLC, | : | |
| *Third-Party Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| BOULEVARD MANAGEMENT, INC., | : | |
| *Third-Party Defendant* | : | |
| | : | AP-ECF Nos. 1, 21, 352, 354 |

## <u>MEMORANDUM OF DECISION AND ORDER AFTER TRIAL</u>

*Appearances*

Imran H. Ansari, Esq.               *Counsel for Curtis James Jackson, III,*
Joseph P. Baratta, Esq.             *Plaintiff and Debtor*
Baratta, Baratta & Aidala, LLP
546 Fifth Avenue, 6th Floor
New York, NY 10036

John L. Cesaroni, Esq.              *Local Counsel for Curtis James Jackson, III,*
James Berman, Esq.                  *Plaintiff and Debtor*
Christopher H. Blau, Esq.
Zeisler and Zeisler
10 Middle Street, 15th Floor
Bridgeport, CT 06604

Thomas K. McCraw, Esq.              *Counsel for GSO Business Management, LLC,*
Freeman, Mathis & Gary, LLP         *Defendant and Third-Party Plaintiff*
60 State Street, Suite 600
Boston, MA 02109-1800

Ilan Markus, Esq.                   *Local Counsel for GSO Business*
Barclay Damon LLP                   *Management, LLC,*
545 Long Wharf Drive, 9th Floor     *Defendant and Third-Party Plaintiff*
New Haven, CT 06511

Robert W. Cassot, Esq.              *Counsel for Boulevard Management, Inc.*
Timothy J. Holzman, Esq.            *Third-Party Defendant*
Morrison Mahoney LLP
One Constitution Plaza, 10th Floor
Hartford, CT 06103

## I.    NATURE OF THE PROCEEDINGS[1]

The plaintiff here – Curtis James Jackson, III ("Mr. Jackson" or "Plaintiff"), known professionally as "50 Cent" – is a world-renowned musician, actor, producer, and entertainer.  Mr. Jackson has also been involved in numerous business ventures for many years.  In 2013, in order to manage these ventures, Mr. Jackson retained the defendant, GSO Business Management, LLC ("Accountants" or "GSO"), as business managers and accountants for himself and the numerous business entities he controlled.

In July of 2015, Mr. Jackson filed an individual Chapter 11 bankruptcy petition and retained GSO in the bankruptcy case to provide him with bankruptcy litigation services, including accounting services regarding monthly operating reports to be filed with the court, assistance in preparation of bankruptcy schedules and statements, and litigation support relating to the meeting of creditors and other bankruptcy matters.  The work for which GSO was retained in the Chapter 11 case was in addition to the work already performed pre-petition on a regular and on-going basis for Mr. Jackson's various business

---

[1]    For the ease of reading this lengthy decision, the PDF document entered on the docket includes bookmarks.

2

entities.[2,3]   It was agreed that payment to GSO for bankruptcy-related work for Mr. Jackson individually would be paid to GSO after application and allowance of GSO's fees pursuant to 11 U.S.C. § 330.[4]

Things did not go well for unknown reasons.   Within several months after the Chapter 11 case commenced Mr. Jackson terminated GSO and hired the third-party defendant, Boulevard Management, Inc. ("Boulevard") to replace GSO as his accountants in the Chapter 11 case.   Boulevard was also hired to replace GSO as business managers and accountants for Mr. Jackson's business ventures outside of the Chapter 11 case.

At trial, Mr. Jackson broadly asserted claims against GSO as follows:[5]

1. GSO improperly paid itself $90,000 from G-Unit Records, Inc.'s ("G-Unit Records") account without court approval pursuant to Bankruptcy Code § 330 in the amount of $30,000.00, for each of the post-petition months of August, September, and October 2015 (the "$90,000 Monthly Fee Claim");

2. GSO improperly paid itself $88,692.51 from Mr. Jackson's debtor-in-possession ("DIP") account for bankruptcy-related services and expenses incurred in July and August 2015 (post-petition) without court approval pursuant to Bankruptcy Code § 330 (the "Bankruptcy Related Fee Claim")[6]; and

---

[2]     Documents filed in the Chapter 11 case and in this adversary proceeding case are referenced as follows:
•     In Chapter 11 bankruptcy case number 15-21233, "ECF No.___"; and
•     in adversary proceeding case number 17-2068 "AP-ECF No.____".

[3]     Mr. Jackson's counsel represented to the court that GSO was "well qualified to perform [accounting and tax services] in a cost-effective, efficient and timely manner," and was "a premier business management firm [with a] staff of certified public accountants, accountants, bookkeepers, as well as in-house royalty and insurance departments. GSO represent[ed] many of the world's top entertainers, musicians, producers, athletes, and high net worth individuals."   ECF No. 27, p. 3-5.   GSO's services included "income tax planning and tax preparation." ECF No. 27, p. 6.

[4]     The Bankruptcy Code is found at Title 11, United States Code. Unless otherwise stated, references to code sections are to the Bankruptcy Code.   This Memorandum of Decision frequently references the Internal Revenue Code, Title 26, United States Code, and 26 U.S.C. § 1398.   Section 1398 is referenced as "IRC § 1398".

[5]     Mr. Jackson also named the individual members of GSO, including Jonathan Schwartz, Michael Oppenheim, Bernard Gudvi, Nicholas Brown, and William Braunstein.   Mr. Jackson's allegations against the individuals are based upon their position as members of the limited liability company, rather than individual conduct.   See, AP-ECF No. 1, ¶¶ 10, 12.

[6]     During trial, Mr. Jackson's counsel orally amended the complaint here by adding a claim for GSO's withdrawals from the DIP account without a court order.  AP-ECF No. 342, p. 63, L. 2-6.

3.  GSO negligently (a) failed to advise Mr. Jackson about the option of
    making a short-year tax election pursuant to 26 U.S.C. § 1398 ("IRC §
    1398") and (b) failed to make a timely short-year tax election (the "IRC §
    1398 Claim"), causing Mr. Jackson to pay more in taxes than he would
    have if the election had been made.
    AP-ECF No. 1.

Mr. Jackson seeks a judgment requiring GSO to: (1) disgorge to Mr. Jackson a total of $178,692.51 ($90,000 + $88,692.51); (2) pay $174,156.00 to Mr. Jackson as actual damages incurred as a result of GSO's failure to make the IRC § 1398 election; and (3) pay Mr. Jackson interest, attorney's fees, costs and punitive damages. AP-ECF No. 354.

GSO denies all liability. AP-ECF No. 10. GSO further asserts any damages stemming from the failure to make the IRC § 1398 election is the fault of Boulevard, because Mr. Jackson terminated GSO before the deadline to make the short-year tax election. AP-ECF No. 21. A seven (7) day bench trial was held on July 19, 20, 21, 23 and August 2, 3, 9, 2021.

## II.    JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over this adversary proceeding by virtue of 28 U.S.C. § 1334(b). This court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1), and the District Court's General Order of Reference dated September 21, 1984. This is a "core proceeding" pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O). This memorandum constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, applicable here pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure. All parties consent to this court entering a final order or judgment in this adversary proceeding. AP-ECF Nos. 49, p. 3-4; AP-ECF No. 352. Should it be determined this court does not have jurisdiction

4

and consent to enter a final order and judgment, this decision constitutes the court's proposed findings of fact and conclusions of law pursuant to 28 U.S.C. § 157(c)(1).

## III.   RELEVANT PROCEDURAL BACKGROUND

This adversary proceeding was filed in connection with Mr. Jackson's voluntary Chapter 11 bankruptcy case commenced on July 13, 2015 ("Petition Date"), bearing case number 15-21233 (the "Main Case").  ECF No. 1.  The court confirmed Mr. Jackson's Chapter 11 plan of reorganization (the "Plan") on July 7, 2016.  ECF No. 552.  Mr. Jackson made all payments required under his Plan, earning a Chapter 11 discharge on February 2, 2017.  ECF No. 764.  Pursuant to the terms of the Plan, Mr. Jackson owns the claims asserted in this adversary proceeding.   This decision addresses events surrounding GSO's employment application in the Main Case and relevant facts from the Main Case are included as needed.

Approximately five months after the discharge order entered, on September 12, 2017, Mr. Jackson commenced this adversary proceeding by filing a verified complaint against the defendants, GSO, Jonathan Schwartz, Michael Oppenheim, Bernard Gudvi, Nicholas Brown, and William Braunstein ("Complaint").  AP-ECF No. 1.  The Complaint is not a model of clarity often lumping allegations and causes of action together, but the following chart sets forth the general allegations.

| Count | Allegation |
|---|---|
| I | GSO breached its fiduciary duty and/or committed negligence causing damages in excess of $200,000 by failing to make the IRC § 1398 election. |
| II | GSO breached its fiduciary duty, engaged in conversion, and/or was unjustly enriched when it paid itself $90,000 from the G-Unit Records account without bankruptcy court approval. |
| III | GSO's conduct constituted a breach of its fiduciary duty, negligence, and/or gross negligence entitling the debtor to compensatory and punitive damages. |

AP-ECF No. 1.

During trial, Mr. Jackson's counsel orally moved to amend the Complaint to conform to the evidence presented by adding the allegation that GSO wrongfully paid itself, not only the $90,000 paid from the G-Unit Records account, but also $88,692.51 in fees paid from Mr. Jackson's DIP account for bankruptcy related services.[7]  GSO consented, and the court granted the oral request.[8]  Mr. Jackson's counsel additionally clarified the damages sought regarding the failure to make the IRC § 1398 election totaled $174,156.00 based upon the evidence, rather than the approximated figure of $200,000 as averred in the Complaint.[9]  As to damages for GSO's wrongful taking of fees, Mr. Jackson clarified he sought disgorgement, attorney's fees, interest and other relief.[10]

The Complaint did not include any specific allegations against the individual defendants (Jonathan Schwartz, Michael Oppenheim, Bernard Gudvi, Nicholas Brown, and William Braunstein).  Rather, the Complaint alleged the individual defendants were liable based upon their status as "owners, partners, managers and/or officers of GSO." AP-ECF No. 1, ¶11.

> [E]ach Defendant was an agent and/or employee of the other Defendants, acting within the scope of such agency or employment, directing ratifying or condoning the acts or omissions of the these Defendants alleged herein, and with the knowledge of any Defendant attributable to all Defendants, and Defendants conspired, condoned, acquiesced, and/or exhibited professional negligence, in furtherance of one another's conduct, and committing the actions as alleged herein, thereby making the actions of any Defendant attributable to all Defendants.
> AP-ECF No. 1, ¶12.

On December 22, 2017, GSO filed a third-party complaint against Boulevard and Neligan, LLP[11] (the "*GSO v. Boulevard* Complaint").  AP-ECF No. 21.  In the *GSO v.*

---

7       AP-ECF No. 342, p. 61-63.
8       AP-ECF No. 342, p. 63, L. 2-6.
9       AP-ECF Nos. 266-6, 273-4; AP-ECF No. 342, p. 63, L. 6-13, p. 66, L. 1-25.
10      AP-ECF No. 342, p. 67, L. 9-25, p. 68, L. 1-9.
11      Neligan LLP ("Neligan") f/k/a Neligan Foley, LLP is a limited liability partnership acting as the Debtor's primary counsel during the Main Case.  Neligan assisted the Debtor's non-attorney professionals,

*Boulevard* Complaint, GSO asserted claims for contribution and indemnification against Boulevard in Counts I and II and similarly against Neligan in Counts III and IV.  AP-ECF No. 21.  As against Neligan, the court dismissed Count III (contribution) as not ripe and granted Neligan's motion to dismiss as to Count IV (indemnification) concluding GSO failed to sufficiently allege Neligan owed any duty to GSO.  AP-ECF Nos. 59, 60.  GSO withdrew Count I (contribution) against Boulevard after conceding the contribution claim was not ripe.  AP-ECF No. 169.  On August 27, 2020, the court denied Boulevard's motion for summary judgment as to Count II (indemnification) concluding disputed material facts required a trial.  AP-ECF No. 165.

At some point in 2018, GSO merged into NKSFB, a firm providing services similar to GSO.[12]  Michael Oppenheim testified NKSFB assumed some, but not all of the liabilities of GSO and GSO would be responsible for any eventual judgment here notwithstanding the merger.[13]

After the plaintiff's evidence, GSO moved for dismissal for failure to establish the *prima facie* elements of the causes of action and for judgment on partial findings pursuant to Fed.R.Civ.P. 41(b) and 52(c), made applicable to this proceeding by Fed.R.Bankr.P. 7041 and 7052.[14]  GSO asserted Mr. Jackson failed to establish the court did not authorize GSO's receipt of the $30,000 monthly compensation from the non-debtor entity, G-Unit Records; failed to show GSO's receipt of $88,692.51 constituted damages to Mr. Jackson or his estate; and failed to prove he suffered any damages from the IRC § 1398 election not being made.[15]

___

including GSO, in becoming court-approved professionals.  AP-ECF No. 21.  At some point not relevant to this decision, Neligan Foley, LLP changed its name to Neligan LLP.
12    AP-ECF No. 337, p. 201, L. 14-25.
13    AP-ECF No. 338, p. 172, L. 9-25, p. 173, L. 1-4.
14    AP-ECF No. 342, p. 68, L. 19-25; AP-ECF No. 352.
15    AP-ECF No. 352.

7

Mr. Jackson, in his post-trial briefing, seeks judgment against GSO on the Complaint as amended and affirmative defenses. AP-ECF Nos. 353, 354. Mr. Jackson argues the evidence supports the conclusion GSO knowingly violated the court's retention order and negligently failed to advise Mr. Jackson regarding the IRC § 1398 election or to make a timely IRC § 1398 election.

Boulevard, in its post-trial briefing, asserts Mr. Jackson failed to establish damages stemming from the alleged failure to make the IRC § 1398 election. AP-ECF No. 351. As a result, Boulevard argues the court cannot conclude GSO was negligent, thus precluding GSO from seeking indemnification from Boulevard. AP-ECF Nos. 351, 355. To the extent GSO claims Boulevard was negligent, Boulevard asserts the evidence fails to support the required elements for indemnification. AP-ECF No. 355.

## IV.    FACTUAL FINDINGS

In accordance with Fed.R.Civ.P. 52 and Fed.R.Bankr.P. 7052, after consideration and analysis of the trial testimony, the documents admitted into evidence, and examination of the official record of the Chapter 11 case and the instant adversary proceeding, I find the following facts.

### Mr. Jackson, His Finances, and His Pre-Petition Relationship with GSO

As a musician, actor, producer, and entertainer, Mr. Jackson created new corporate entities for different ventures as needed ("Jackson-related entities").[16] In 2013, Mr. Jackson retained GSO to assist in managing his personal and business finances and to provide business management, tax, and accounting services to Mr. Jackson and to the Jackson-related entities.[17]    On the Petition Date, GSO was a business manager for

---

[16]    AP-ECF No. 337, p. 40, L. 9-25; *see also*, ECF No. 484, p. 8-11.
[17]    AP-ECF No. 337, p. 41, L. 1-16, p. 42, L. 1-17, p. 203, L. 12-22.

approximately thirty Jackson-related entities, including G-Unit Records.  GSO specialized in providing accounting and business management services to individuals and businesses in the entertainment industry.[18]  Michael Oppenheim, a partner at GSO, was responsible for overseeing Mr. Jackson's account.[19]  Other GSO employees who worked on the account included Mai Pho (accountant), Monica Cisek (bookkeeper), Barbara Wintroub (insurance), and Steve Ambit (royalties).[20]

Each month from late 2013 through the Petition Date, G-Unit Records, a company wholly owned by Mr. Jackson, paid GSO a monthly retainer fee of $30,000, plus reimbursement for any expenses (the "$30,000 Monthly Fee").[21]  The  $30,000 Monthly Fee was paid in advance, and generally within the first two weeks of each month from G-Unit Records to GSO.  Once paid, the fee was earned for the entire month regardless of the services provided.[22]

Mr. Jackson provided GSO with a limited power of attorney authorizing GSO to prepare and sign checks on his behalf from his personal account and the Jackson-related entities' bank accounts, including the $30,000 Monthly Fee payments from G-Unit Records.[23]  Mr. Oppenheim testified GSO engaged in a three-step approval process before drawing checks from Mr. Jackson's accounts, and his approval would be the final step when he signed the check.[24]

---

[18]     AP-ECF No. 337, p. 201, L. 5-12.
[19]     AP-ECF No. 337, p. 46, L. 10-18, p. 206, L. 16-25, p. 207, L. 6-14; AP-ECF No. 338, p. 9, L. 10-13.
[20]     AP-ECF No. 265-13; AP-ECF No. 287, p. 70, L. 16-19; AP-ECF No. 337, p. 204, L. 20-25, p. 205, L. 15-24.
[21]     AP-ECF No. 251-10; ECF No. 27, p. 5; AP-ECF No. 337, p. 229, L. 14-25; AP-ECF No. 338, p. 28, L. 24-25, p. 29, L. 1.
[22]     AP-ECF No. 338, p. 79, L. 1-5, L. 6-12, 24-25.
[23]     AP-ECF No. 337, p. 209, L. 8-22, p. 230, L. 2-19.
[24]     AP-ECF No. 337, p. 208, L. 1-7, p. 209, L. 17-22; AP-ECF No. 337, p. 211, L. 3-12, p. 212, L. 2.

Other than the limited power of attorney and an initial 2013 email identifying the $30,000 Monthly Fee amount, there is no evidence of a written agreement between GSO and Mr. Jackson delineating the scope of GSO's authority to write checks from Mr. Jackson's or G-Unit Records' accounts.[25]  Nothing in the record specifies whether, or under what term or condition, GSO would be required to seek approval from Mr. Jackson before paying any expense, including the $30,000 Monthly Fee.[26]  Mr. Oppenheim admitted and understood GSO owed a fiduciary duty to Mr. Jackson and the Jackson-related entities.[27]

### Chapter 11 Bankruptcy Petition

When Mr. Jackson commenced the Chapter 11 case in July 2015, he retained Attorney Patrick Neligan ("Attorney Neligan") as his primary bankruptcy counsel.[28]  In addition to Attorney Neligan, Mr. Jackson was represented by other attorneys working with Attorney Neligan including Attorney Seymour Roberts.  Separately, Attorney Stephen Savva acted as general counsel for Mr. Jackson.[29]  Mr. Jackson filed bankruptcy primarily to address judgments awarded against him in favor of two creditors, Sleek Audio, LLC and Lastonia Leviston (together, the "Major Judgment Creditors").[30]  Mr. Oppenheim testified that Mr. Jackson or his counsel informed GSO of Mr. Jackson's intent to file bankruptcy only the evening before the Petition Date.[31]

---

[25]     AP-ECF No. 251-10; AP-ECF No. 337, p. 209, L. 8-22, p. 230, L. 2-19.
[26]     AP-ECF No. 337, p. 209, L. 23-25, p. 210, L. 1-24, p. 230, L. 14-25.
[27]     AP-ECF No. 337, p. 231, L. 9-13; AP-ECF No. 338, p. 131, L. 21-24, p. 134, L. 24-25, p. 153, L. 1.
[28]     ECF No. 34.
[29]     AP-ECF No. 338, p. 66, L. 24-25, p. 67, L. 1, 10-12.
[30]     AP-ECF No. 337, p. 43, L. 17-25, p. 44, L. 1-13; AP-ECF No. 338, p. 33, L. 12-24.  *See also*, ECF No. 27, p. 2 ("Debtor's bankruptcy filing is not primarily a result of excessive current expenses exceeding his current revenues, but rather the substantial costs of litigation and resulting awards against him in the past year which total in excess of $20 million").
[31]     AP-ECF No. 337, p. 214, L. 10-12.

***Retention of GSO During Bankruptcy***

Soon after the Petition Date, Mr. Jackson moved to employ GSO as his financial advisors and accountants ("Retention Application").[32]  GSO did not retain its own counsel or file a request for notice in the Main Case.  Mr. Oppenheim testified he understood GSO possessed a duty to treat Mr. Jackson's finances in a conservative manner following the Petition Date.[33]

In the Retention Application, Mr. Jackson disclosed GSO had provided services to him personally and to approximately 31 Jackson-related entities prior to the Petition Date.[34]  The Retention Application further disclosed that G-Unit Records routinely paid GSO the $30,000 Monthly Fee for those pre-petition services.[35]  Mr. Jackson proposed retaining GSO – post-petition – on the same pre-petition terms:

> The Debtor proposes to continue this arrangement post-petition. In this way, GSO will perform the Financial Advisory and Accounting Services for the Debtor and the Related Entities, [sic] but will not be paid by the Debtor.  GSO will continue to be paid by the non-debtor entity G-Unit Records Inc. [sic]. ECF No. 27, p. 7.

Importantly, paragraph 20 of the Retention Application requested GSO be excused from filing fee applications pursuant to §§ 330, 331 for the services provided to the Jackson-related entities and bifurcated the services GSO was providing into two categories: 1) Financial Advisory and Accounting Services to be paid by G-Unit Records and 2) Litigation Support services.  In particular, paragraph 20 provided:

> For the provision of Financial Advisory and Accounting Services, **the Debtor proposes that GSO not be required to file fee applications because GSO will not be paid by the Debtor or his bankruptcy estate.** However, the Debtor also requires GSO, including its employee Mai Pho, to undertake litigation support and testimony services (collectively, "Litigation Support"). This Litigation Support will be performed solely for the benefit of the Debtor and not

---

[32]   ECF No. 27.
[33]   AP-ECF No. 338, p. 132, L. 9-14.
[34]   ECF No. 27. ECF No. 27-1, p. 3; AP-ECF No. 338, p. 38, L. 4-17.
[35]   ECF No. 27, p. 5.

any of the other Related Entities. For the provision of Litigation Support, the Debtor proposes that GSO apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, corresponding Local Rules, orders of this Court and guidelines (the "Guidelines") established by the United States Trustee (the "UST").
ECF No. 27, ¶ 20 (**Emphasis Added**).

The Retention Application's initial proposed order specifically excused GSO from the requirement to file applications for compensation or seek bankruptcy court approval for the $30,000 Monthly Fees.[36]

While it is unclear whether GSO ever received a copy of the filed Retention Application, Mr. Oppenheim acknowledged GSO provided the information contained in the Retention Application.[37] Jonathan Schwartz, a partner at GSO having authority to sign on its behalf, executed a declaration in support of the Retention Application pursuant to Fed.R.Bankr.P. 2014(a).[38] The Declaration affirmed GSO and its employees were qualified to provide to Mr. Jackson the services described in the Retention Application. During trial, Plaintiff's counsel spent a considerable time eliciting testimony from Mr. Oppenheim regarding Mr. Schwartz's signing of the Declaration, the degree Mr. Schwartz was involved with Mr. Jackson's accounts at GSO, and Mr. Schwartz's criminal history related to management of accounts belonging to other client(s). The argument that Mr. Schwartz's criminal activity in unrelated matters tainted the Declaration filed in the Main Case is unpersuasive.

The Major Judgment Creditors initially objected to the Retention Application, specifically contesting the request for GSO to be excused from seeking court approval for the $30,000 Monthly Fee, but later withdrew their objection.[39] They asserted the court

---

[36] ECF No. 27-2.
[37] AP-ECF No. 338, p. 7, L. 21-23, p. 8, L. 1-16.
[38] AP-ECF No. 338, p. 23, L. 10-13; AP-ECF No. 338, p. 27, L. 18-25.
[39] ECF Nos. 79, 85.

should review the reasonableness of the $30,000 Monthly Fee because Mr. Jackson received income as G-Unit Records' owner and any compensation paid to GSO directly impacted Mr. Jackson's – and correspondingly the estate's – receipt of income.[40]  Joining the objection, the Office of the United States Trustee ("UST") asserted Mr. Jackson's proposal to excuse fee applications for the $30,000 Monthly Fee improperly circumvented the Bankruptcy Code.[41]  There is no evidence GSO was served with these objections and Mr. Oppenheim testified he was unaware of them.[42]

Prior to the court's consideration of the Retention Application, in July and early August 2015, GSO and its employees, Mr. Schwartz and Mai Pho, provided services to Mr. Jackson related to his bankruptcy, including but not limited to appearing at a meeting of creditors pursuant to Bankruptcy Code § 341.[43]

### The Retention Hearing

On August 26, 2015, the court held a hearing to consider the Retention Application ("Retention Hearing").[44]  Again, there is no evidence GSO was served with notice of the Retention Hearing date.[45]  During the Retention Hearing, Attorney Neligan represented the following to the court:

> If we did not make that clear in the application, I've talked with Mr. Oppenheim at GSO today and he is very clear that work specifically done for Mr. Jackson in connection with the bankruptcy they will bill for, they will present a fee application and, you know, under [Bankruptcy Code §] 330.  The work that they are doing for the companies -- each have their own separate creditors and, you know, are separate from Mr. Jackson -- will continue, you know, because those companies, other than SMS Promotions, are not in bankruptcy.[46]

---

40    ECF Nos. 79, 85.
41    ECF No. 98.
42    AP-ECF No. 338, p. 34, L. 3-8.
43    AP-ECF No. 338, p. 21, L. 16-18.
44    ECF No. 938 (Transcript of Hearing on August 26, 2015).
45    ECF No. 99.
46    ECF No. 938, p. 42, L. 7-16.

13

Noting its objection appeared resolved, Sleek Audio's counsel responded:

> I believe that resolves all of our concerns if GSO is going to be applying to the Court under the bankruptcy code for compensation for work done in the case for Mr. Jackson, it seems to me that resolves our issues. … And whatever they're doing for companies that are not in bankruptcy, you know, they can do. They're not constrained by the provisions of the bankruptcy code from doing that to my way of thinking. So I think we're fine with that subject to seeing the order.[47]

The court directed Attorney Neligan to submit a revised proposed order based upon the parties' agreement announced during the Retention Hearing.[48]  Following the submission of a revised proposed order, the court approved the retention of GSO ("Retention Order") on September 18, 2015, using substantially the parties' form of order.[49]  Paragraphs 3 and 4 of the Retention Order addressed GSO's compensation for services provided to Mr. Jackson as follows:

> 3. GSO will file a supplemental retention application with the Court if the scope of services that GSO proposes to provide to the Debtor expands beyond the scope discussed herein.

> 4. GSO will be compensated in accordance with any interim procedures set forth in § 331, and as may be fixed by order of the Court. Such compensation shall be reviewed under the standard set forth in § 330(a).[50]

The Retention Order was silent as to a requirement for GSO to seek court approval prior to being paid the $30,000 Monthly Fee.  The court served the Retention Order on GSO.[51]

### *The $30,000 Monthly Fee Payments*

Shortly before the Retention Hearing, on August 13, 2015, GSO transferred $30,000.00 from the G-Unit Records' account to pay itself the August $30,000 Monthly Fee.[52]  On September 2, 2015 (before the Retention Order entered) and October 5, 2015

---

47  ECF No. 938, p. 42, L. 21-25, p. 43, L. 1-5.
48  ECF No. 938, p. 103, L. 20-25.
49  ECF Nos. 131, 149.
50  ECF No. 149, p. 2.
51  ECF No. 156.
52  AP-ECF No. 273-1; AP-ECF No. 337, p. 48, L. 11-17; AP-ECF No. 338, p. 80, L. 23-25.

(after the Retention Order entered), respectively, GSO transferred $30,000.00 from the G-Unit Records' account to pay itself for the September and October $30,000 Monthly Fees. [53]  Mr. Oppenheim testified he believed court approval was unnecessary for each of the $30,000 Monthly Fee payments, and no application for their allowance was filed.[54] These three payments constitute the $90,000 Monthly Fee Claim Mr. Jackson asserts GSO should disgorge – presumably to him rather than to the corporation as G-Unit Records is not a party here – as improperly paid without court approval.

Mr. Jackson testified he never authorized GSO to withdraw funds from the G-Unit Records' account or to compensate itself in this manner.[55]  This testimony in 2022 – which I find to be sincere and credible as to Mr. Jackson's understanding –conflicts with statements by his attorney during the August 2015 Retention Hearing and with other evidence regarding the pre-petition fee arrangement with GSO.[56]

### Termination of GSO and Retention of Boulevard

Three months after the Petition Date, on October 13, 2015, Mr. Jackson requested Todd Bozick, a partner and certified public accountant at Boulevard, prepare a letter for his signature to be sent to GSO terminating its services ("Termination Letter").[57]  Mr. Jackson retained Boulevard to start working for him and for the Jackson-related entities as of November 1, 2015.[58]  The Termination Letter authorized GSO to release all Mr. Jackson's "business management, accounting and tax files" to Boulevard.[59]

---

[53]    AP-ECF No. 273-2; AP-ECF No. 273-3; AP-ECF No. 338, p. 83, L. 11-19; p. 84, L. 21-25, p. 85, L. 1-7.
[54]    AP-ECF No. 338, p. 24, L. 1-6, p. 41, L.13-17, p. 43, L. 4-5, p. 46, L. 9-17, p. 50, L. 12-16, p. 80, L. 6-11, p. 85, L. 8-11.
[55]    AP-ECF No. 337, p. 48, L. 20-23, p. 49, L. 12-13.
[56]    AP-ECF No. 251-10; ECF No. 27, p. 5; AP-ECF No. 337, p. 229, L. 14-25; AP-ECF No. 338, p. 28, L. 24-25, p. 29, L. 1.
[57]    AP-ECF No. 265-21; AP-ECF No. 337, p. 47, L. 6-9, p. 52, L. 24-25, p. 53, L. 1-12; AP-ECF No. 341, p. 153, L. 24-25, p. 180, L. 17-23.
[58]    AP-ECF No. 337, p. 48, L. 15-17, p. 53, L. 23-25, p. 54, L.1-2; *see also*, ECF Nos. 220, 293, 334.
[59]    AP-ECF No. 265-21.

Mr. Bozick had never met Mr. Jackson personally or any of his attorneys or agents before preparing the Termination Letter, but was aware Lester Knistel, a senior partner at Boulevard, met with Mr. Jackson's counsel, Attorney Savva, around the time of the Termination Letter.[60] Mr. Bozick was unaware Mr. Jackson was a Chapter 11 debtor and debtor-in-possession at the time he sent the Termination Letter, believed he learned of that fact closer to November 1, 2015, or even later.[61] Mr. Bozick acknowledged he took no steps to familiarize himself with Mr. Jackson's financial condition prior to Mr. Jackson becoming Boulevard's client and assumed Lester Knistel undertook some unspecified efforts.[62]

### *Payment of $88,692.51 from the DIP Account*

On the same date he received the Termination Letter (October 13, 2015), Mr. Oppenheim emailed Attorney Neligan inquiring if GSO needed court approval before certain fees could be paid.[63] Two days later, on October 15, 2015, Mr. Oppenheim emailed again requesting payment of GSO's outstanding invoices for litigation services GSO provided to Mr. Jackson.[64] Mr. Oppenheim attached five (5) outstanding invoices to his email as detailed in the following chart.

| Invoice Date | Description | Amount | Citation |
|---|---|---|---|
| July 31, 2015 | Professional Services | $49,494.00 | AP-ECF No. 265-17 |
| July 31, 2015 | Schwartz and Pho New York Trip Expenses | $14,434.12 | AP-ECF No. 265-16 |
| July 31, 2015 | Oppenheim New York Trip Expenses | $4,431.78 | AP-ECF No. 265-15 |
| August 31, 2015 | Oppenheim New York Trip Expenses | $7,182.61 | AP-ECF No. 265-19 |
| August 31, 2015 | Professional Services | $13,150.00 | AP-ECF No. 265-18 |
| | **Total** | **$88,692.51** | |

---

[60]     AP-ECF No. 341, p. 180, L. 9-12, p. 182, L. 5-15.
[61]     AP-ECF No. 341, p. 182, L. 24-25, p. 183, L. 1-9, p. 196, L. 2-24.
[62]     AP-ECF No. 341, p. 183, L. 22-25, p. 184, L. 1-10.
[63]     AP-ECF No. 251-11.
[64]     AP-ECF No. 265-13; AP-ECF No. 338, p. 108, L. 4-24.

According to Mr. Oppenheim, these invoices represented fees and expenses incurred for bankruptcy litigation services.[65]  Mr. Oppenheim could not explain why he did not seek payment for these invoices earlier, at the end of July or August.[66]  On October 29, 2015 – without any response from Attorney Neligan and without court approval – GSO transferred $88,692.51 from Mr. Jackson's DIP account to pay GSO for the five outstanding invoices.[67]

Mr. Oppenheim knew GSO lacked court approval to pay fees incurred for bankruptcy related services.

> Q:    Will you agree with me that the $88,692.51, you know you paid yourself, meaning GSO paid itself without court approval?
>
> A:    Yes.
>
> Q:    And you knew that back in 2015, correct?
>
> A:    I don't know if it's back in 2015 when we realized it, but we realized it certainly in 2016 or maybe the later part of 2015.[68]

Using Mr. Jackson's power of attorney for the DIP account, Mr. Oppenheim transferred the money from the DIP account to GSO without having applied for or obtained a court order pursuant to Bankruptcy Code § 330 and Fed.R.Bankr.P. 2016, because he did not believe Mr. Jackson (or agents on his behalf) would pay the outstanding invoices.[69]

### *September and October Invoices, and, A Request to Return the $88,692.51*

In addition to the time GSO incurred in July and August 2015, GSO provided bankruptcy litigation services in September and October of 2015.  GSO maintains the

---

[65]    AP-ECF No. 338, p. 51, L. 12-16, p. 73, L. 11-15.
[66]    AP-ECF No. 338, p. 104, L. 5-7.
[67]    ECF No. 281, p. 11; AP-ECF No. 265-20; AP-ECF No. 338, p. 26, L. 17-22, p. 47, L. 5-10, 20-23, p. 70, L. 3-11, p. 89, L. 8-11, p. 91, L. 19-25, p. 92, L. 21-25.
[68]    AP-ECF No. 338, p. 46, L. 18-22, p. 47, L. 5-7.
[69]    AP-ECF No. 337, p. 211, L. 15-22, p. 99, L. 1-8; AP-ECF No. 338, p. 65, L. 14-17, p. 99, L. 5-8, p. 104, L. 8-17.

17

September bill was for $3,072.50 and the October bill was $6,762.50.[70]  In an email to Attorney Neligan dated November 10, 2015, Mr. Oppenheim wrote, "[w]e still expect our September and October invoice to be paid.  November is on us."[71]  Approximately, one month later on December 7, 2015, Mr. Oppenheim emailed Boulevard requesting he arrange payment of GSO's September and October 2015 invoices before the end of 2015.[72]  GSO never received payment for the September and October 2015 invoices.[73]

Thereafter, on January 6, 2016, Attorney Roberts emailed Mr. Oppenheim requesting GSO's outstanding invoices to allow him to start drafting a fee application for GSO.[74]  Less than a week later, Attorney Roberts emailed Mr. Oppenheim a draft application for compensation without any amounts included for time incurred between July 1, 2015 through November 1, 2015.[75]  Attorney Roberts noted the application was to be signed by GSO notwithstanding that he drafted it by stating in an email, "the signing party has to be GSO, not the Debtor's attorney. We will upload the pleading for GSO … but the pleading has to look like to comes from GSO."[76]

Approximately two weeks later, on February 4, 2016, Attorney Roberts emailed Mr. Oppenheim again and this time requested that GSO return the $88,692.51 taken from the DIP account.[77]  Mr. Oppenheim declined the request and to date GSO has not returned the money.[78]

---

[70]    AP-ECF No. 251-19; AP-ECF No. 282-1, 282-2.
[71]    AP-ECF No. 265-24.
[72]    AP-ECF No. 251-18.
[73]    AP-ECF No. 338, p. 195, L. 24-25.
[74]    AP-ECF No. 251-19.
[75]    AP-ECF No. 251-19.
[76]    AP-ECF No. 251-21.
[77]    AP-ECF No. 265-9; AP-ECF No. 338, p. 48, L. 17-23, p. 60, L. 10-20, p. 64, L. 16-22.
[78]    AP-ECF No. 338, p. 64, L. 20-22, p. 66, L. 19-23, p. 75, L. 10-11.

The next day, on February 5, 2016, GSO sent Attorney Roberts the signed application seeking approval of $98,559.91 in fees.[79] Nothing in the executed application disclosed the unauthorized October 29, 2015 payment to GSO from the DIP account. The application was never filed and no other application for compensation was ever filed by GSO.  No one pursued GSO for the return of the $88,692.51 in the Main Case.

### Mr. Jackson's 2014 Personal Taxes

At some unknown point after the Petition Date (July 13, 2015) but before receiving the Termination Letter (October 13, 2015), Mr. Oppenheim met with Mr. Jackson to discuss completion of his 2014 personal tax returns.[80]  The deadline for filing Mr. Jackson's 2014 individual state and federal tax returns was October 15, 2015.[81] On some unknown date in October 2015, GSO completed and filed Mr. Jackson's tax returns for the 2014 tax year.[82]  The 2014 tax returns are not in the record before the court.

### Transfer of Mr. Jackson's Files from GSO to Boulevard

Following receipt of the Termination Letter, GSO and Boulevard agreed GSO would be responsible for all bill paying, payroll, and other ongoing day-to-day banking activities through the end of October 2015.[83]  Boulevard and GSO agreed November 1, 2015, would be the date Boulevard would assume responsibility for the day-to-day accounting activities.[84]  On November 3, 2015, Attorney Neligan filed an application to employ Boulevard to replace GSO in Mr. Jackson's bankruptcy case.[85]  While the application initially did not specify an end date for services by GSO, the order that

---

[79]   AP-ECF No. 251-23.
[80]   AP-ECF No. 338, p. 140, L. 12-13; p. 141, L. 15-22.
[81]   AP-ECF No. 222, p. 156, L. 15-22; AP-ECF No. 342, p. 52, L. 16-19.
[82]   AP-ECF No. 337, p. 216, L 15-22, p. 217, L. 1-13; AP-ECF No. 341, p. 156, L. 15-22.
[83]   AP-ECF No. 251-6; AP-ECF No. 341, p. 185, L. 1-14, p. 191, L. 15-19.
[84]   AP-ECF No. 251-6.
[85]   ECF No. 220; and as later amended, ECF No. 293.

eventually entered in February 2016 authorizing Boulevard's employment specified – at Debtor's request – that Boulevard's employment commenced effective November 1, 2015.[86]

Despite Mr. Oppenheim offering to personally meet with Boulevard to discuss Mr. Jackson's financial affairs, an in-person meeting between GSO and Boulevard never occurred.[87]

Mr. Bozick's testimony supported the fact that Boulevard assumed responsibility as Mr. Jackson's business managers and accountants as of November 2015 with one exception.[88]    Boulevard requested GSO, despite its termination, prepare and file Mr. Jackson's non-profit organization's – the G-Unity Media Foundation (the "Foundation") – tax return due to its impending filing deadline of November 15, 2015.[89]    Because November 15, 2015 fell on a Sunday, the filing deadline became November 16, 2015.[90] Mr. Jackson understood GSO, despite termination, would be providing tax advice and services related to the Foundation.[91]    Boulevard was unaware GSO needed to provide any other tax related services to Mr. Jackson because the deadline for filing his personal 2014 tax return passed on October 15, 2015.[92]

Prior to the end of October 2015, Boulevard and GSO agreed GSO would begin transferring Mr. Jackson's financial documents, including all Datafaction (an accounting software program) files, general ledgers, royalty statements, insurance, contracts, tax returns for Mr. Jackson personally and his related entities, and all business records

---

[86]    ECF Nos. 220, 293, 334.
[87]    AP-ECF No. 251-14; AP-ECF No. 341, p. 194, L. 1.
[88]    AP-ECF No. 341, p. 154, L. 17-21.
[89]    AP-ECF No. 337, p. 219, L. 10-15; AP-ECF No. 338, p. 146, L. 4-7; AP-ECF No. 341, p. 156, L. 1-5; p. 200, L. 11-21.
[90]    AP-ECF No. 341, p. 79, L. 22-25, p. 80, L. 1-18.
[91]    AP-ECF No. 337, p. 57, L. 4-6, 13-15.
[92]    AP-ECF No. 341, p. 156, L. 6-14.

pertaining to Mr. Jackson and the Jackson-related entities.[93]  On November 1, 2015, GSO completed the transfer of Mr. Jackson's electronically stored Datafaction files, which included the accounting ledgers, financial statement data, and bank transaction records.

Due to a series of ineffective attempts to communicate and coordinate regarding the transfer of Mr. Jackson's tax information in early November 2015, Boulevard did not receive Mr. Jackson's tax records – including the 2014 return – until November 17, 2015, the day after the short-year election deadline.[94]  Boulevard knew it needed Mr. Jackson's 2014 tax returns to provide future tax services to Mr. Jackson, but, according to Mr. Bozick was unaware "of any sort of urgency to obtain the tax files."[95]  It seems clear that with diligence Boulevard could have obtained and reviewed the tax information necessary to make a timely, informed decision about the IRC § 1398 election.

### The Missed IRC § 1398 Election Deadline

Both before and after the Petition Date, Mr. Jackson relied upon GSO to provide tax advice to him.[96]    Mr. Oppenheim acknowledged Mr. Jackson's reliance and understood GSO had a duty to provide post-petition tax assistance.[97]  Incredibly, there is no evidence that GSO – or later Boulevard – made any attempt to learn whether any special tax provisions might apply to their lucrative client.

Because Mr. Jackson was an individual Chapter 11 debtor, the provisions of IRC § 1398 applied.  As a general rule, the taxable year for an individual debtor is determined without regard to the filing of a bankruptcy case.[98]  However, IRC § 1398 provides an

---

[93]     AP-ECF No. 341, p. 155, L. 1-23.
[94]     AP-ECF No. 341, p. 156, p. 23-25, p. 157, L.1-10 and L. 21-24, p. 163, L. 5-23, p. 158, L. 5-6, p. 161, L. 9-25, p. 162, L. 11-19, p. 179, L. 15-20, p. 184, L. 15-20; AP-ECF Nos. 265-23; 265-24; 265-26.
[95]     AP-ECF No. 341, p. 161, L. 19-25, p. 179, L. 15-20.
[96]     AP-ECF No. 337, p. 55, L. 1-5, 16-22.
[97]     AP-ECF No. 338, p. 104, L. 23-25, p. 143, L. 22-24, p. 140, L. 8-22.
[98]     26 U.S.C. § 1398(d)(1).

individual Chapter 7 or 11 debtor with an option to make one irrevocable election to split the year into two taxable years.[99]  The first short taxable year begins on the first day of the debtor's normal tax year (a calendar year for individuals, commencing on January 1) and ends on the day before the day the bankruptcy case was commenced (*i.e.,* the day before the petition date).[100]  The second taxable year begins on the petition date and ends at the end of the debtor's normal tax year (for an individual, on December 31).[101]  If a debtor does not make the IRC § 1398 election, the debtor will file a single tax return for the year in which the case is commenced.[102]

### The Effect of Making the IRC § 1398 Election – or Not

If a debtor makes the IRC § 1398 election, any federal income tax liability for the first short tax year becomes an allowable claim against the bankruptcy estate as a claim arising prepetition, entitled to priority under Bankruptcy Code § 507(a)(8), and collectible to the extent estate assets are available.[103]  The IRC § 1398 election is usually a "taxpayer favorable election and the chief motivation for making that election is to allow for the tax associated with the annualized income of a debtor's short year to be payable out of the bankruptcy estate as a priority claim."[104]  In the absence of an IRC § 1398 election, a debtor's tax return for the calendar year will include income and gains generated from the whole year (to the extent they are not included in income of the estate), and the debtor will have to pay the total tax liability for the year from his or her post-petition earnings.[105]

---

[99]    26 U.S.C. § 1398(d)(2).
[100]   26 U.S.C. § 1398(d)(A)(1).
[101]   26 U.S.C. § 1398(d)(A)(2); C. Richard McQueen, *Tax Aspects of Bankruptcy Law* 3d § 20:16.
[102]   11 *Collier on Bankruptcy* ¶ TX2.05 (16th).
[103]   *See*, 11 U.S.C. § 507(a)(8); 11 *Collier on Bankruptcy* ¶ TX4.02 (16th); *see also*, ¶ *C-9802 Election by Individual Debtor in a Bankruptcy Case to Close Tax Year*., Federal Tax Coordinator, Second Edition, Research Institute of America, (c) 2022.
[104]   AP-ECF No. 342, p. 28, L. 1-5.
[105]   11 *Collier on Bankruptcy* ¶ TX2.05 (16th).

Another consequence of not making an IRC § 1398 election is the bankruptcy estate succeeds to all net operating loss carryovers existing "as of the first day of the year of the filing of a petition under the Bankruptcy Code."[106]   These net operating loss carryovers, treated as property of the bankruptcy estate when an election is not made, can be used in offsetting any estate tax.[107]   In that circumstance, the individual cedes the net operating loss carryovers to the bankruptcy estate.  If the estate concludes without having used them all, the individual would then be able to use any remaining net operating loss carryovers, prospectively.[108]

In most cases, a debtor would make the IRC § 1398 election if income was earned prior to the petition date and especially if taxes are anticipated to be owed.  "If the individual has earned income up to the date the petition is filed and has net operating losses, the individual could file the short tax return, and then offset the income earned during the short year against the net operating loss. Then, any balance of the net operating loss after this adjustment would be carried over to the estate as of the date the bankruptcy petition is filed."[109]   However, the debtor would most likely not make the election if there was a loss for this time period.[110]

Whether to make an IRC § 1389 election requires consideration, and an accountant should review and know whether a debtor had any carryover items from prior tax years such as a net operating loss, what the current year income was, and the breakdown between income prior to the bankruptcy petition date and what is anticipated

---

[106]    11 *Collier on Bankruptcy* ¶ TX2.04 (16th).
[107]    AP-ECF No. 342, p. 28, L. 21-25.
[108]    C. Richard McQueen, Tax Aspects of Bankruptcy Law 3d § 13:12.
[109]    § 155:14. Short-year election, 8 *Norton Bankr. L. & Prac.* 3d § 155:14.
[110]    § 155:14. Short-year election, 8 *Norton Bankr. L. & Prac.* 3d § 155:14.

after the petition date.[111]  Making the election without analyzing a debtor's income, loss, and tax attributes could expose them to additional tax liability.[112]

> "In order to make an intelligent decision, the taxpayer must know the nature and extent of the tax attributes that will pass to the bankruptcy estate. Thus, it is imperative that the tax return for the preceding year be completed so that the taxpayer will know what carryover items will be available. Then, the taxpayer must determine as precisely as possible, the amount of income, gain or loss which would be reflected on a short-period return if the election is made, or on the full calendar return if the election is not made. If the election will enable the taxpayer to avoid tax liability for the short-period, it should probably be made." [113]

Here, neither Mr. Oppenheim nor anyone at GSO advised Mr. Jackson of the option to make the IRC § 1398 election.[114]

> Q:    And did you advise Curtis Jackson as to the 1398 elections at all after the filing a bankruptcy [sic]?
> A:    Nope.
> …
> Q:    So in October, when you completed his [2014] return, is it fair to say that you would have had the ability to provide him that advice?
> A:    Yes.
>
> Q:    Did you provide him that advice?
> A:    Nope.[115]

Mr. Oppenheim noted "[w]e no longer ever lend financial advice or tax advice to anybody once they let us go."[116]  While Mr. Oppenheim testified he did not advise Mr. Jackson about making the IRC § 1398 election because he believed he needed Mr. Jackson's 2014 taxes to be completed first, this testimony is discounted.[117]  The failure to render advice was not somehow reasoned or considered, but rather appears to be the result of GSO's failure to recognize and take action regarding the IRC § 1398 short year

---

111    AP-ECF No. 341, p. 175, L. 19-25, p. 176, L. 1-4.
112    AP-ECF No. 341, p. 176, L. 22-25, p. 174, L. 1-4.
113    11 *Collier on Bankruptcy* ¶ TX17.07 (16th).
114    AP-ECF No. 337, p. 55, L. 16-18; AP-ECF No. 338, p. 145, L. 5-14.
115    AP-ECF No. 337, p. 218, L. 21-25, p. 219, L.1, 20-22; AP-ECF No. 338, p. 143, L. 14-17.
116    AP-ECF No. 337, p. 220, L. 9-10.
117    AP-ECF No. 337, p. 218, L. 9-24; AP-ECF No. 338, p. 149, L. 15-20.

election. [118]  For example, contrary to what would be expected if GSO was waiting for the 2014 tax return to be finished to make the decision about whether the make the short-year election or not, GSO did not communication to Mr. Jackson or his bankruptcy lawyers that this was something that needed to be addressed before November 16, 2015. Similarly, when GSO learned of Mr. Jackson's Chapter 11 bankruptcy filing in July 2015, it appears no one attempted to speed the finalization of the 2014 tax return or to take other reasonable steps to determine whether GSO was going to recommend the IRC § 1398 election be made, or not.

### When and How a Debtor Makes the IRC § 1398 Election

If a debtor chooses to make an IRC § 1398 election, the debtor must do so on or before the 15th day of the fourth full month following the end of that first short taxable year."[119]  Here, the IRC § 1398 election deadline was November 16, 2015 (coincidentally, the same filing deadline as the Foundation's tax return).[120]

A debtor makes the election by filing a complete tax return for the first short taxable year and writing – "§ 1398 Election" –  on the tax return.[121]  There is no extension of time to make the IRC § 1398 election, and if not made, the opportunity to make the election is lost.[122]  However, a debtor may seek an extension of time to file the short year tax return, but in doing so, must expressly make the election (again, writing "§ 1398 Election" on the

---

[118]    AP-ECF No. 338, p. 143, L. 14-21.
[119]    26 C.F.R. § 301.9100-14T; 26 U.S.C. §§ 1398(d)(2)(D), 6072(a); *see also*, AP-ECF No. 342, p. 29, L. 5-25.
[120]    AP-ECF No. 337, p. 219, L. 13-19; AP-ECF No. 338, p. 146, L. 8-12.
[121]    26 C.F.R. § 301.9100-14T(d); 11 *Collier on Bankruptcy* ¶ TX2.05 (16th); *see also*, AP-ECF No. 342, p. 29, L. 5-25.
[122]    11 *Collier on Bankruptcy* ¶ TX2.05 (16th); *see also*, *In re Nation*, 2014 Bankr. LEXIS 426 (Bankr. E.D. Okla. 2014); *In re Allen*, 359 B.R. 1, 8 (Bankr. D. Mass. 2006); *In re Turboff*, 93 B.R. 523 (Bankr. S.D. Tex. 1988); AP-ECF No. 342, p. 29, L. 17-25, p. 30, L. 1-4.

form) with the application to extend the time to file the return.[123]  Here, the record is clear

neither Mr. Jackson nor anyone on his behalf made the IRC § 1398 election.[124]

### *Boulevard's IRC § 1398 Involvement*

Mr. Bozick testified he was unaware of the IRC § 1398 short-term election deadline

when he wrote the Termination Letter for Mr. Jackson to sign, had never made an IRC §

1398 election in his career, and had never previously had a client in bankruptcy.[125]

> Q:    Mr. Bozick, to my understanding, you personally were not aware of § 1398 in the Internal Revenue Code until after GSO had provided Boulevard the tax documents for Mr. Jackson. Is that correct?
> A:    That's correct.
>
> Q:    And so, given that, you were not aware of the pending deadline to make a § 1398 election at this time during the transition of documents from GSO to Boulevard. Is that correct?
> A:    That's correct.
>
> Q:    And is it fair to say that because you weren't aware of the pending deadline, there was no sense of urgency for yourself or for Boulevard to obtain the tax documents for Mr. Jackson from GSO any sooner than when it actually received those documents from GSO?
> A:    That's correct.[126]

Mr. Bozick expected GSO would have informed Boulevard during the transition if there

was a pending deadline.[127]  But, GSO never informed Boulevard about either the IRC §

1398 election deadline or the existence of any analysis by GSO as to whether making the

IRC § 1398 election would benefit Mr. Jackson.[128]

---

[123]    11 *Collier on Bankruptcy* ¶ TX2.05 (16th); *see also*, AP-ECF No. 342, p. 29, L. 20-25.  The court notes this description of the IRC § 1398 election process is more accurate than the court's description in its Memorandum of Decision denying Boulevard's motion for summary judgment.  AP-ECF No. 165.  The difference in the two descriptions would not change the result in AP-ECF No. 165.
[124]    AP-ECF No. 337, p. 219, L. 10-22, p. 221, L. 1-13.
[125]    AP-ECF No. 341, p. 179, L. 15-23, p. 188, L. 13-17, p. 189, L. 8-13.
[126]    AP-ECF No. 341, p. 188, L. 13-25, p. 189, L. 1-3.
[127]    AP-ECF No. 341, p. 199, L. 3-7.
[128]    AP-ECF No. 341, p. 177, L. 13-21.

After receiving Mr. Jackson's tax records on November 17, 2015, Boulevard's tax director, Mike Feinstein determined – on a preliminary basis – that the IRC § 1398 election might have been beneficial to Mr. Jackson because he had net operating loss carryovers reported on his 2014 return.[129]  Besides testimony reporting the mere existence of net operating loss carryovers, no party offered evidence as to the amount of those net operating losses.  Boulevard was unaware at this time in November 2015 if the IRC § 1398 election had been made and, after learning it had not been made, notified Mr. Jackson and his general counsel, Attorney Savva.[130]

### *Damages As A Result of Failure to Make § 1398 Election*

Mr. Jackson asserts he suffered damages from GSO's failure to make the IRC § 1398 election because he incurred personal tax liability for 2015 he otherwise could have avoided.[131]  As part of the Complaint, Mr. Jackson included a sworn statement averring his loss was approximately $200,000.[132]  During trial, Mr. Jackson offered Internal Revenue Service (IRS) Form 8879 – IRS e-file Signature Authorization ("Form 8879") as evidence of damages.[133]  Form 8879 is not a tax return and is not filed with the IRS, but rather is a declaration document and signature authorization for an e-filed return to be filed by an electronic return originator.[134]  Form 8879 indicated Mr. Jackson had an adjusted gross income of $990,461 and owed $174,156 in federal income taxes, including late penalties and interest, for the tax year 2015.[135]  Without interest and fees, the amount

---

[129]    AP-ECF No. 341, p. 172, L. 13-24, p. 174, L. 2-13, p. 198, L. 10-18.
[130]    AP-ECF No. 341, p. 174, L. 14-18; p. 203, L. 15-25.
[131]    AP-ECF No. 337, p. 57, L. 23-25, p. 58, L. 4-5.
[132]    AP-ECF No. 342, p. 64, L. 18-25.
[133]    AP-ECF Nos. 266-6 (sealed); 273-4 (redacted).
[134]    IRS Website, About Form 8879, IRS e-file Signature Authorization. https://www.irs.gov/forms-pubs/about-form-8879 (last checked August 18, 2022).
[135]    AP-ECF No. 342, p. 65, L. 19-25, p. 66, L. 1-10; AP-ECF Nos. 266-6 (sealed); 273-4 (redacted).

owed totaled $165,848.  Mr. Bozick testified Mr. Jackson could have avoided this personal liability by making the election and utilizing the 2014 net operating loss carryovers.[136]

> Q:    And that – the payment of those taxes could have been avoided if the 1398 election was made, correct?
> A:    Correct.[137]

However, no foundational evidence was provided supporting Mr. Bozick's belief. Mr. Jackson presented no evidence providing the amount of 2014 net operating loss carryovers that existed, the amount of income earned during the first short year period, or any substantiation for the numbers listed on Form 8879.  Mr. Jackson offered neither the 2014 nor the 2015 tax returns into evidence.  No party presented an analysis showing what Mr. Jackson's tax liability would have been had the election been made.

Mr. Jackson's bankruptcy estate used the 2014 net operating loss carryovers to offset income and lower the estate's tax burden.[138]  Mr. Bozick testified the bankruptcy estate, and Mr. Jackson, personally, used the net operating loss carryovers until the final net operating loss carryover was used in 2018 after confirmation of his Chapter 11 Plan and discharge.[139]

### *Mr. Jackson's Expert Witness*

Mr. Jackson offered expert testimony from Len Sprishen, LL.M., a tax attorney practicing with the firm, MSPC Certified Public Accountants and Advisors ("MSPC"), on several issues including

> 1)    the ethical codes governing the conduct of accountants;
> 2)    background information regarding IRC § 1398 and its tax implications to individuals filing a Chapter 11 bankruptcy petition;
> 3)    an accountant's duty to advise a client regarding the IRC § 1398 election; and

---

[136]    AP-ECF No. 341, p. 174, L. 21-25; p. 210, L. 20-23, p. 212, L. 7-13, p. 214, L. 8-10.
[137]    AP-ECF No. 341, p. 212, L. 11-13.
[138]    AP-ECF No. 341, p. 209, L. 1-14.
[139]    AP-ECF No. 341, p. 208, L. 17-25, p. 212, L. 22-25, p. 1-2.

4)  an accountant's duty to furnish information to a successor accountant or accounting firm.[140]

Mr. Sprishen testified he had advised approximately six or seven past clients regarding the IRC § 1398 election.[141]  Part of Mr. Sprishen's responsibilities with MSPC included advising the firm's accountants regarding compliance with the model code of professional conduct promulgated by the American Institute of Certified Public Accountants (AICPA) and applicable state-specific codes of conduct adopted in New York, New Jersey, and California.[142]  The AICPA model code provides, in relevant part, that "[a] member who is required to return or provide records to the client should comply with the client's request as soon as practicable but, absent extenuating circumstances, no later than 45 days after the request was made."[143]  Mr. Sprishen noted the California Society of Certified Public Accountants, a California professional association of certified public accountants, had adopted in large part the AICPA model code.[144]

Mr. Sprishen testified an accountant has a duty to understand the tax implications of all actions by a client, including the tax ramifications of filing bankruptcy.[145]

> [R]ules underpinning that relationship of providing services, tax services to clients, are underpinned by competence and diligence and so an accountant always has to be cognizant of the potential tax implications of doing something or not doing something for a client every year.  And they have to -- to the extent that they're not familiar with something, it's incumbent on them to become educated about a particular point of tax law or tax compliance in order to best avail their clients of their services.[146]

---

[140]    AP-ECF No. 342, p. 10, L. 2-6. AP-ECF No. 342, p. 18, L. 19-25, p. 19, L. 1, 8-22, p. 20, L. 9-18.
[141]    AP-ECF No. 342, p. 17, L. 21-25.
[142]    AP-ECF No. 342, p. 11, L. 11-25, p. 12, L. 1-17, p. 13, L. 6-18, p. 14, L. 3-16, p. 16, L. 1-8, p. 20, L. 6-18, p. 23, L. 14-18.
[143]    AP-ECF No. 341, p. 68, L. 3-16, p. 107, L. 7-23.
[144]    AP-ECF No. 342, p. 13, L. 19-25, p. 14, L. 1-2, p. 36, L. 18-22.
[145]    AP-ECF No. 342, p. 39, L. 20-25, p. 40, L. 1-13.
[146]    AP-ECF No. 342, p. 35, L. 21-25, p. 36, L. 1-6.

This duty was an on-going one requiring an accountant to keep a client apprised of tax elections and tax developments that may affect a client's overall tax liability.[147]

As it pertained to making an IRC § 1398 election, Mr. Sprishen believed diligence required an accountant to be informed about the actual tax ramifications of making the election.[148] He testified an accountant should have a client's prior year's tax return and an accurate understanding of the current year's income and losses to evaluate whether the IRC § 1398 election would be beneficial.[149] Mr. Sprishen explained circumstances may exist making the IRC § 1398 election advantageous or disadvantageous:

> And, the most common situation one is where you have losses, current year losses. So the year where you're going to file your bankruptcy petition, in that year, if you have current year losses, if you make the election, those losses become part of the estate. If you don't make the election, those losses are preserved, right, they're not carried over automatically like NOLs. So those losses could be used to offset future income.[150]

Given GSO's representation of Mr. Jackson for several months following the Petition Date, Mr. Sprishen believed GSO had sufficient time to have advised Mr. Jackson about the IRC § 1398 election.[151] Mr. Sprishen testified GSO fell below the applicable standard of care when it failed to advise Mr. Jackson about the option and effect of the IRC § 1398 election during the pendency of his bankruptcy.[152] Mr. Sprishen also believed it would have been "good practice" and would have fulfilled their final duties owed to Mr. Jackson, if GSO informed Boulevard about upcoming deadlines when transferring Mr. Jackson's file to them.[153] Mr. Sprishen acknowledged in light of the lack of a IRC § 1398

---

147    AP-ECF No. 342, p. 38, L. 9-13.
148    AP-ECF No. 342, p. 37, L. 1-10.
149    AP-ECF No. 342, p. 30, L. 5-11, p. 52, L. 2-15.
150    AP-ECF No. 342, p. 32, L. 14-21.
151    AP-ECF No. 342, p. 41, L. 5-9.
152    AP-ECF No. 342, p. 46, L. 13-16.
153    AP-ECF No. 342, p. 46, L. 1-5.

election, the bankruptcy estate obtained the benefit of any net operating losses and "those benefits would be in the form of tax refunds or credits towards future … tax in future years for the estate returns."[154]

As for the transfer of Mr. Jackson's documents, Mr. Sprishen believed almost every code of ethics placed a duty on accounting firms, such as GSO, to transfer documents promptly to a successor firm, such as Boulevard.[155]   In trying to define "prompt," Mr. Sprishen noted the AICPA model code provided documents should be transferred no later than 45 days.[156]   He interpreted the 45-day deadline as a ceiling on what would be considered reasonable noting however, extenuating circumstances might cause 45 days to be considered too long of a time frame.[157]   Mr. Sprishen understood from an assumed set of facts Mr. Jackson's counsel provided him that Boulevard received Mr. Jackson's tax files from GSO on approximately November 17, 2015, after the deadline for making the election.[158]   Mr. Sprishen was not aware of when GSO made Mr. Jackson's tax files available to Boulevard, only the date when Boulevard received them.[159]   Nonetheless, Mr. Sprishen opined GSO's transfer of Mr. Jackson's financial information to Boulevard fell below the applicable standard of care because the transfer was not completed "in a fashion that would have enabled [Boulevard] to make the requisite determination" of whether or not to make the IRC § 1398 election.[160]

Mr. Sprishen's information regarding the events involving Mr. Jackson, GSO, and Boulevard derived from Mr. Jackson's Complaint allegations, Boulevard's motion for

---

[154]    AP-ECF No. 342, p. 55, L. 6-11.
[155]    AP-ECF No. 342, p. 39, L. 4-10; AP-ECF No. 342, p. 45, L. 7-10.
[156]    AP-ECF No. 342, p. 39, L. 4-10.
[157]    AP-ECF No. 342, p. 39, L. 4-14.
[158]    AP-ECF No. 342, p. 56, L. 16-24.
[159]    AP-ECF No. 342, p. 57, L. 20-25.
[160]    AP-ECF No. 342, p. 33, L. 9-12, p. 46, L. 17-24.

summary judgment and supporting documents, GSO's documents in opposition to summary judgment, and the court's ruling denying summary judgment.[161]  Mr. Sprishen understood – solely based upon his review of Mr. Jackson's Complaint – that Mr. Jackson's personal tax liability was approximately $200,000 including penalties and interest.[162]  Mr. Sprishen did not review any tax returns, tax forms, or financial statements in preparation for providing an opinion in this case.[163]  He was unaware of whether Mr. Jackson had net operating losses from 2014 or what Mr. Jackson's income was for any period of 2015.[164]  He did not analyze what Mr. Jackson's tax liability would have been with or without the short-year election.[165]

### *GSO's Expert Witness*

GSO offered expert testimony from Bruce Kolbrenner, a certified public accountant licensed in New York and California and a member of the AICPA and California Society of Certified Public Accountants.[166]  Mr. Kolbrenner indicated over the course of his career he had acquired approximately 50 to 100 clients from other firms and, conversely, transferred approximately 25 clients to other firms.[167]  He further noted the circumstance of having a client transition from one business management firm to another was not unusual.  While not designated as an expert, Mr. Bozick held the same opinion that it was not unusual for clients to transition from one business management firm to another.[168]

Mr. Kolbrenner had never previously rendered an opinion as to the standard of care for accountants, never authored any publication regarding an accountant's standard

---

[161]    AP-ECF No. 342, p. 54, L. 1-4.
[162]    AP-ECF No. 342, p. 33, L. 23-25, p. 34, L. 1-4, L. 22-24, p. 35, L. 1-4, p. 54, L. 5-10.
[163]    AP-ECF No. 342, p. 49, L. 12-15, p. 53, L. 19-24.
[164]    AP-ECF No. 342, p. 49, L. 16-21.
[165]    AP-ECF No. 341, p. 54, L. 11-14.
[166]    AP-ECF No. 341, p. 20, L. 2-16.
[167]    AP-ECF No. 341, p. 23, L. 7-21.
[168]    AP-ECF No. 341, p. 185, L. 24-25, p. 186, L. 1-2.

of care, and never testified regarding an accountant's standard of care.[169]  Prior to this case, Mr. Kolbrenner was unfamiliar with the provisions of IRC § 1398, had no experience making an IRC § 1398 election, had never advised a client regarding IRC § 1398, and had never evaluated the effects of an IRC § 1398 election.[170]  In fact, Mr. Kolbrenner assumed – if he had a client in bankruptcy – the client's bankruptcy counsel would inform him about the IRC § 1398 election.[171]

The Plaintiff objected to Mr. Kolbrenner's expert testimony because his general knowledge of the standard of care owed to a client during the transfer of files in a general context from one financial firm to another was irrelevant to the claim here dealing with the specific circumstances of what duty is owed when a file transfer occurs immediately preceding the IRC § 1398 election deadline.[172]  Counsel for Boulevard joined the objection noting it could not see how Mr. Kolbrenner's expert opinion could aid in evaluating whether or not GSO breached its duty in advising Mr. Jackson about the IRC § 1398 election.[173]

Because of his lack of prior experience, the court finds Mr. Kolbrenner's testimony regarding IRC § 1398 to be of little or no value.  The only relevant testimony Mr. Kolbrenner provided regarding IRC§ 1398 was his statement that it is important for an accountant "to make an informed decision for a client as to whether to make a [§ 1398] election" – an opinion not requiring an expert.[174]  The court allowed Mr. Kolbrenner to testify as an expert, on a limited basis, as to the standard of care applicable to business

---

[169]    AP-ECF No. 341, p. 29, L. 23-25, p. 30, L. 1-4, p. 35, L. 24-25, p. 36, L. 1-15, p. 39, L. 12-14, 22-25.
[170]    AP-ECF No. 341, p. 24, L. 13-17; p. 28, L. 14-17, p. 34, L. 2-19, p. 36, L. 16-22.
[171]    AP-ECF No. 341, p. 94, L. 1-20.
[172]    AP-ECF No. 341, p. 43, L. 2-25, p. 44, L. 1-23.
[173]    AP-ECF No. 341, p. 47, L. 10-25, p. 48, L. 1- 25, p. 49, L. 1.
[174]    AP-ECF No. 341, p. 145, L. 1-5.

management firms and accountants providing services to the California music industry, specifically as it related to the factual circumstances of transferring management responsibility from one firm or accountant to another.[175]

Mr. Kolbrenner believed once a client announced they were hiring a new firm, the original firm would have no further responsibilities, except for transferring documents and files in a timely manner.[176]  Mr. Kolbrenner could not define "timely" beyond reference to the AICPA's 45-day guideline.[177]

> Q.    Prior to being retained -- and when you say timely manner, what do you refer to when you discuss timely manner? Can you give an idea in terms of a time frame that you're discussing?
>
> A.    Less than two weeks. Could be two weeks. It could be a week, three weeks. It depends on the status of the files.
>
> Q.    So a timely manner in your opinion would be two weeks or less than two weeks?
>
> A.    It could weeks, a week, three weeks, it's in a timely manner.[178]

Based in part on the AICPA's 45-day guideline and in part on his 45 years of experience, Mr. Kolbrenner opined that GSO's transmission of Mr. Jackson's files to Boulevard in early November following the Termination Letter was timely, conducted without substantial delay, and fell within an accountant's standard of care.[179]

The court gives little weight to Mr. Kolbrenner's opinion.  His definition of timely was vague and bordered on inconsistent.  Mr. Kolbrenner failed to explain whether the timeliness analysis for transferring files was standard across the industry or based upon

---

[175]    AP-ECF No. 341, p. 29, L. 6-14, p. 38, L. 7-17; p. 51, L. 11-20.
[176]    AP-ECF No. 341, p. 63, L. 3-7, p. 76, L. 7-14, p. 77, L. 5-9.
[177]    AP-ECF No. 341, p. 98, L. 1-16.
[178]    AP-ECF No. 341, p. 97, L. 5-14.
[179]    AP-ECF No. 341, p. 53, L. 10-23, p. 67, L. 17-21; p. 75, L. 2-9, p. 87, L. 1-11, p. 106, L. 3-14.

a client's particular factual situation.[180]  To the extent he believed a client's specific facts impacted the timeliness analysis, Mr. Kolbrenner lacked credentials to opine on the timeliness of GSO's transfer here because he had neither knowledge regarding IRC § 1398 nor experience with a bankrupt client transferring firms.[181]  Further, the reliability of his opinion – to the extent based on the AICPA 45-day guideline – is questionable at best. When questioned as to what might constitute an extenuating circumstance under the AICPA's 45-day guideline, Mr. Kolbrenner refused to hypothesize.[182]  Mr. Kolbrenner admitted he could not recall reading or citing to the guideline prior to this case and could not recall an instance when the guideline had been relevant to his practice.[183]

Mr. Kolbrenner believed a proposed new firm should review a potential client's financial situation before agreeing to accept them as a client.[184]  Here, Mr. Kolbrenner believed a business management firm (such as Boulevard) acquiring Mr. Jackson as a client – after Mr. Jackson had filed bankruptcy – should have known of the bankruptcy.[185] He also believed the new firm had a duty to be aware, or make itself aware, of deadlines and conditions attendant to having a client who was a debtor and debtor in possession in a Chapter 11 case (including the IRC § 1398 deadline).[186]  Mr. Kolbrenner believed this duty required the new firm to meet and discuss the client's affairs with all of the client's counsel, agents, managers, and prior firm.[187]  But, he did not believe the new firm should expect the prior firm to provide information about pending deadlines.[188]

---

180    *Compare*, AP-ECF No. 341, p. 119, L. 6-8 ("transfers of files is (sic) pretty standard within our industry that we receive the documents within a short period of time"), with p. 97, L. 9-10 (It could be a week, three weeks. It depends on the status of the files.").
181    AP-ECF No. 341, p. 102, L. 6-10, p. 106, L. 3-14.
182    AP-ECF No. 341, p. 109, L. 17-24, p. 110, L. 3-17, p. 113, L. 14-15, 18, p. 114, L. 3-9.
183    AP-ECF No. 341, p. 99, L. 3-5, 5-25, p. 118, L. 7-18.
184    AP-ECF No. 341, p. 70, L. 19-25, p. 71, L. 1-2.
185    AP-ECF No. 341, p. 59, L. 20-24.
186    AP-ECF No. 341, p. 70, L. 12-18.
187    AP-ECF No. 341, p. 65, L. 6-20, p. 66, L. 6-16.
188    AP-ECF No. 341, p. 92, L. 12-24.

Here, Mr. Kolbrenner concluded Boulevard failed to maintain the standard of care required in accepting Mr. Jackson as a client by failing to do adequate due diligence and failing to obtain Mr. Jackson's files in a timelier fashion.[189]  Mr. Kolbrenner was unaware of any meetings occurring between GSO and Boulevard, but he believed Boulevard bore the burden to seek the information from GSO because they should have known about Mr. Jackson's bankruptcy and the IRC § 1398 election deadline.[190]

Again, Mr. Kolbrenner's opinion of Boulevard's conduct is of little value given the limited scope of information he reviewed regarding Boulevard's conduct.  GSO's counsel provided Mr. Kolbrenner with communications exclusively between GSO and Boulevard. Mr. Kolbrenner was not provided with any communications Boulevard may have had with Mr. Jackson's various counsel or others regarding Mr. Jackson's financial situation.[191] Mr. Kolbrenner simply assumed Boulevard knew or should have known of the IRC § 1398 deadline based upon conversations with Mr. Jackson's bankruptcy counsel – conversations about which he lacked any information.[192]   Further, Mr. Kolbrenner provided no basis for the opinion that Boulevard deviated from the standard of care when it waited for information rather than insisting on an immediate transfer of tax information from GSO, but GSO met the standard of care by providing Boulevard with the tax information by November 17, 2015.[193]

### *Boulevard Retention Hearing and Mr. Jackson's Chapter 11 Plan Confirmation*

On December 28, 2015, Attorney Roberts emailed GSO and Boulevard stating there might be confusion about whether the Retention Order allowed GSO to be paid the

---

[189]   AP-ECF No. 341, p. 74, L. 3-12; 17-19.
[190]   AP-ECF No. 341, p. 66, L. 17-19, p. 72, L. 22-25, p. 74, L. 3-6.
[191]   AP-ECF No. 341, p. 81, L. 7-24.
[192]   AP-ECF No. 341, P. 129, L. 11-17.
[193]   AP-ECF No. 341, p. 90, L. 1-18.

36

$30,000 Monthly Fees without the requirement of filing fee applications.[194]    Attorney

Roberts indicated the intent to clarify the confusion during a hearing scheduled for

January 7, 2016 to consider Mr. Jackson's application to employ Boulevard.[195]

> During the January 7, 2016 hearing, Attorney Berman represented:
>
> Basically, much like GSO, Boulevard will file fee applications for services provided to the Debtor's estate. It has a flat fee that doesn't require fee applications to the non-Debtor entities, that said, the creditors wanted language to say that the fact that it doesn't require fee applications for the non-Debtor entities, they preserve their rights to look into the services Boulevard provides non-Debtor entities, look at the fees that the non-Debtor entities pay, and that was acceptable to us that is probably the biggest change.[196]

There was no other discussion regarding GSO during the January 7, 2016 hearing.

On May 25, 2016, Mr. Jackson proposed his Third Amended Plan of

Reorganization ("Plan").[197]    The Plan embodied a settlement reached among Mr.

Jackson, the Major Judgment Creditors and a creditor bank.  The Debtor did not serve

GSO with copies of the Plan, Disclosure Statement, or Order Approving the Disclosure

Statement.[198]    However, the court served GSO with the Order Approving the Disclosure

Statement, which scheduled the July 2016 Plan confirmation hearing date.[199]

On July 7, 2016, the court confirmed Mr. Jackson's Plan and served GSO with the

confirmation order and Plan.[200]    Mr. Jackson's Plan provided a deadline for the filing of

any administrative fee claims within sixty (60) days of the Plan's effective date.[201]

According to the Plan, failure to file an application for allowance of professional fees would

---

[194]    AP-ECF No. 251-18. I note the language of the Retention Order was proposed by Attorney Neligan after consultation and agreement with the counsel who participated in the Retention Hearing, including counsel for the United States Trustee.
[195]    AP-ECF No. 251-18.
[196]    ECF No. 300 at 00:12:52 – 00:13:56.
[197]    ECF No. 485.
[198]    ECF No. 494.
[199]    ECF No. 490.
[200]    ECF Nos. 552; 557.
[201]    ECF No. 485, p. 14.

result in the claim being barred.[202]  Additionally, the Plan excepted GSO from its limited plan exculpation provision ("[n]one of Debtor's court appointed professionals, with the exception of GSO Business Management L.L.C., shall have or incur any liability to the Debtor").[203]  Approximately one week later, Mr. Oppenheim emailed Attorney Roberts and Attorney Neligan inquiring about GSO's outstanding fees for September and October 2015.[204]  Attorney Roberts promised to send a draft fee application to Mr. Oppenheim but no evidence of any further communication between them is in the record.[205]

On August 10, 2016, Mr. Jackson filed a notice regarding the occurrence of the Plan's effective date and the resulting administrative fee claim deadline of September 20, 2016.[206]  This notice was not served on GSO, although as noted GSO was served with the Plan containing the sixty (60) day deadline to file administrative fee claims.[207]  Mr. Jackson also provided notice of the Plan deadlines by newspaper publication ("providing that upon publication all known and unknown claimants shall have received actual or constructive notice of the Debtor's bankruptcy and the deadlines for filing proofs of claim or seeking the allowance and payment of administrative claims.").[208]  GSO failed to file an application seeking approval of compensation by the September 20, 2016 deadline, or at any other time.

---

[202]    *Id.*
[203]    ECF No. 485, p. 43, §13-12.  Notably, the third-party defendant Boulevard was included in the exculpation and release language of the Plan, thereby eliminating any liability Boulevard might have directly to Mr. Jackson.
[204]    ECF No. 251-26.
[205]    ECF No. 251-26.
[206]    ECF No. 583.
[207]    ECF No. 584.
[208]    *See*, ECF No. 605, 606.

## V.    BURDEN OF PROOF AND APPLICABLE LAW

### *Standard for Motion on Pleadings*

GSO moved for a judgment of dismissal on all of Mr. Jackson's claims pursuant to Fed.R.Civ.P. 52(c), made applicable to this adversary proceeding by Fed.R.Bankr.P. 7052.  Federal Rule of Civil Procedure 52(c) provides in relevant part: "If a party has been fully heard on an issue during a non-jury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim ... that, under the controlling law, can be maintained ... only with a favorable finding on that issue." Fed.R.Civ.P. 52(c).  Rule 52(c) "authorize[s] a dismissal at the close of the plaintiff's case if the plaintiff ha[s] failed to carry an essential burden of proof."  *Pal v. New York U.*, 06 CIV. 5892 PAC FM, 2013 WL 4001525, at *7 (S.D.N.Y. Aug. 6, 2013)(internal citations omitted), *aff'd*, 583 Fed. Appx. 7 (2d Cir. 2014)(*summary order*).  "A Rule 52(c) motion made by a defendant may be granted where the plaintiff has failed to make out a prima facie case or where the plaintiff has made out a prima facie case but the court determines that a preponderance of the evidence goes against the plaintiff's claim."  *Knox v. U.S.*, 3:12CV01741(SALM), 2016 WL 4724558, at *1 (D. Conn. Sept. 9, 2016)(internal citations omitted).

As with any judgment, a court must find facts specially and state its conclusions of law separately.  Fed.R.Civ.P. 52(a), 52(c).  But unlike summary judgment, Rule 52(c) does not require favorable inferences in favor of the non-moving party and allows a court "to make credibility determinations and resolve disputed issues of fact, applying the same standard of proof and weigh[ing] the evidence as it would at the conclusion of the trial." *Cosmopolitan Int. NY Corp. v. Dist. Council 9 Intl. Union of Painters and Allied Trades*,

19-CV-2669 (JSR), 2021 WL 5331538, at *1 (S.D.N.Y. Nov. 16, 2021)(internal citations omitted).

### *Bankruptcy Court Authority to Award Compensation*

Bankruptcy Code § 327(a) permits a trustee or – in a case under Chapter 11 – a debtor-in-possession to employ professionals such as accountants with the court's approval if they do not hold or represent an interest adverse to the estate, are disinterested, and will assist the trustee or debtor-in-possession with carrying out the obligations under the Bankruptcy Code.  11 U.S.C. § 327(a).  Another Bankruptcy Code provision, § 330(a)(1), provides "a bankruptcy court may award ... reasonable compensation for actual, necessary services rendered by those professionals." 11 U.S.C. § 330.  "[T]he statute authorizes an award of compensation to one of three types of persons: trustees, examiners, and § 327 professional persons." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004).  "[Section] 330(a)(1) does not authorize compensation awards … from estate funds, unless [the professionals] are employed as authorized by § 327." *Lamie*, 540 U.S. at 538.

### *Requirement for Professionals to File a Fee Application*

Federal Rule of Bankruptcy Procedure 2016 provides, "[a]n entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate *shall file an application*…"  Fed.R.Bankr.P. 2016(a)(*emphasis added*).  Such applications must be sufficiently detailed to allow the court to perform its required, and independent, assessment of reasonableness under § 330(a).  *See, In re Molina*, 632 B.R. 561, 571 (Bankr. S.D.N.Y. 2021); 9 *Collier on Bankruptcy* ¶ 2016.12 (16th).

### *Remedies*

While Bankruptcy Code § 330 provides authority for a bankruptcy court to award compensation to professionals employed pursuant to § 327, and Fed.R.Bankr.P. 2016 requires such professionals to file an application for allowance of compensation, the source of a bankruptcy court's authority to impose a remedy for conduct that violates these provisions is derived from equitable principles including the court's inherent power to enforce its own orders and the principles embodied in Bankruptcy Code § 105(a).

Where a professional fails to file an application for allowance of compensation prior to payment, a court has discretion to order disgorgement. *Miller v. Simpson*, 325 Fed. Appx. 25, 27 (2d Cir. 2009)(bankruptcy court did not abuse its discretion in ordering disgorgement of fees paid from the net sale proceeds, without prior bankruptcy court authorization under § 330(a))(*summary order*); *In re Chatkhan*, 496 B.R. 687, 696 (Bankr. E.D.N.Y. 2012)("The provision of the Retention Order mandating court approval prior to payment of [the firm's] fees is clear. In any event, [the firm] could have sought clarification if the firm was unclear about its obligations under the Retention Order."); *see also*, *Morris v. King (In re Rosales),* 621 B.R. 903, 930 (Bankr. D. Kan. 2020)(full disgorgement of fees ordered where special counsel failed to comply with the requirements of Rule 2016, § 329, and § 330(a)(4)(B), failed to file a fee application, and failed to offer any compelling, mitigating circumstances that would allow the Court to order less than full disgorgement). "Disgorgement is an equitable remedy which requires [a] [c]ourt to exercise its powers under § 105(a) of the Bankruptcy Code." *In re Soussis,* 624 B.R. 559, 563 (Bankr. E.D.N.Y. 2020), *aff'd sub nom. Soussis v. Macco,* 20-CV-05673 (JMA), 2022 WL 203751 (E.D.N.Y. Jan. 24, 2022); *see also, Matter of Arlan's Dept. Stores, Inc.,* 615 F.2d 925, 943

(2d Cir. 1979)("There is no doubt of the inherent power of a bankruptcy judge to deny fees and disbursements where serious breaches of fiduciary obligations occur.").

A bankruptcy court's authority to impose remedies other than simple disgorgement in the context of violations of its orders or the process provided by Bankruptcy Code § 330 and Fed.R.Bankr.P. 2016 – including interest, costs, or attorney's fees -- is also grounded in Bankruptcy Code § 105(a). The Bankruptcy Code "charges the bankruptcy court with carrying out its own orders …." *In re JNL Funding Corp.*, 620 B.R. 25, 28-29 (Bankr. E.D.N.Y. 2020), *aff'd sub nom Weigel as Tr. of JNL/Forgione Distrib. Tr. v. Barnard*, CV 20-3570 (GRB), 2021 WL 3793794 (E.D.N.Y. Aug. 26, 2021); *see also Arlan's Dept. Stores, Inc.,* 615 F.2d at 943 (finding no abuse of discretion when bankruptcy court ordered disgorgement with interest). A bankruptcy court has power under Bankruptcy Code § 105(a) including the authority to "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement courts orders or rules, or to prevent an abuse of process" in carrying out the Bankruptcy Code's provisions. *See, In re Ajasa*, 627 B.R. 6, 19 (Bankr. E.D.N.Y. 2021). When applied here to the context of bankruptcy professionals' compensation, Bankruptcy Code § 105(a) provides the court with the means to enforce the provisions of §§ 326-331. Importantly, without authority to impose interest, costs or attorney's fees – in addition to disgorgement – the bankruptcy court would be without an effective remedy to compensate bankruptcy estates, debtors, trustees and creditors for violations of the process required by Bankruptcy Code § 330 and Fed.R.Bankr.P. 2016. To hold otherwise would leave an estate or trustee without full compensation for the litigation cost associated with seeking disgorgement of funds taken from the estate without authority.

### *Bankruptcy Code § 362(a)(3): Exercise of Control Over Property of the Estate*

Bankruptcy Code § 362(a)(3) prohibits the exercise of control over property of the estate.  Here, GSO – without court authorization – withdrew funds from the DIP account to compensate itself.  This situation is similar to the facts in *In re Schissler*, 07-61319, 2007 WL 3254360 (Bankr. N.D.N.Y. Nov. 2, 2007).  There, special counsel disbursed a portion of settlement proceeds to itself in payment of its fees without court approval of the settlement or the fees.

> Having concluded that [special counsel] violated the automatic stay by directing the disbursement of the proceeds generated pursuant to the settlement of the State Court action without prior approval of this Court and also violated an Order of this Court by failing to seek approval for its fees and disbursements, the Court deems it appropriate pursuant to Code § 105 to require [special counsel] to disgorge the fees.
> *In re Schissler*, 07-61319, 2007 WL 3254360 (Bankr. N.D.N.Y. Nov. 2, 2007).

The bankruptcy court concluded disgorgement of special counsel's fees was an appropriate remedy.  *In re Schissler*, 07-61319, 2007 WL 3254360, at *4 (Bankr. N.D.N.Y. Nov. 2, 2007).  "A bankruptcy court confronted with a professional's violation of the Code and/or Rules is afforded a great deal of latitude in fashioning an appropriate sanction." *Vergos v Mendes & Gonzales PLLC (In re McCrary & Dunlap Constr. Co., LLC)*, 79 Fed. Appx. 770, 779 (6th Cir. 2003)(internal citations omitted).

### *Professional Malpractice*

None of the parties addressed the choice of substantive state law to evaluate negligence or professional malpractice.  Mr. Jackson filed bankruptcy in Connecticut, GSO was based in California, and a significant amount of Mr. Jackson's business was conducted in New York and California.  The parties' pre-trial proposed conclusions of law all cite to Connecticut law for the elements of a cause of action sounding in malpractice, and that is the law the court will apply.  *American Fuel Corp. v. Utah Energy Development*

*Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997) ("where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry"). Even if the court were to consider New York or California law, however, it would reach the same conclusion because the elements of professional malpractice are the same.[209]

Under Connecticut law, "[t]o establish liability for professional malpractice, a plaintiff must be able to show the following: (1) a duty to conform to a professional standard of care for the plaintiff's protection; (2) a deviation from that standard of care; (3) injury; and (4) a causal connection between the deviation and the claimed injury." *Stuart v. Freiberg*, 316 Conn. 809, 833 (2015). After establishing a defendant did not exercise reasonable care for that profession, a plaintiff must prove the two components of causation. *See*, *Rawls v. Progressive N. Ins. Co.*, 310 Conn. 768, 776-777 (2014). "The first component, causation in fact, requires us to determine whether the injury would have occurred but for the defendant's conduct." *Stuart v. Freiberg*, 316 Conn. at 833 (*citing*, *Winn v. Posades*, 281 Conn. 50, 56 (2007). "The second component is proximate causation" and requires a court determine "whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries." *Winn v. Posades*, 281 Conn. at 56. "That is, there must be an unbroken sequence of events that tied [the plaintiff's]

---

[209]    Under California law, the elements of a claim for professional negligence are: " '(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence.' " *Paul v. Patton*, 185 Cal. Rptr. 3d 830, 835 (Cal. App. 6th Dist. 2015). To establish a claim of professional malpractice under New York law, "a plaintiff must prove a departure from accepted standards of practice of that profession in the relevant area and that the departure was a proximate cause of the plaintiff's injury." *Mary Imogene Bassett Hosp. v. Cannon Design, Inc.*, 9 N.Y.S.3d 687, 690 (App. Div. 2015). These elements are generally established through "credible expert testimony that [the] defendants deviated from locally prevailing standards of practice." *Talon Air Servs. LLC v. CMA Design Studio, P.C.*, 927 N.Y.S.2d 643, 646 (App. Div. 2011). Evidence must be sufficient to support an award of damages. *Gertler v. Sol Masch & Co.*, 835 N.Y.S.2d 178, 179 (App. Div. 2007)(damages evidence insufficient where the damages theory presented by plaintiffs' expert was based on assumptions and speculation as to what plaintiff trustee might have done as an individual investor had he been advised by defendants of the applicable taxes when trading on margin in a pension account.).

injuries to the [defendant's conduct].... This causal connection must be based upon more than conjecture and surmise."  *Stuart v. Freiberg*, 316 Conn. at 833 (citations omitted.). As to the fourth element – damages – Connecticut law prohibits an award of damages where the damages are speculative.  "It is axiomatic that the burden of proving damages is on the party claiming them.... When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty." *Viejas Band of Kumeyaay Indians v. Lorinsky*, 116 Conn. App. 144, 163 (2009); s*ee also*, *Bridgeport Harbour Place I, LLC v. Ganim*, 131 Conn. App. 99, 123 (2011)("Although we recognize that damages for lost profits may be difficult to prove with exactitude . . . such damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount with reasonable certainty.").

### Indemnification

"[A]n action for indemnification is one in which one party seeks reimbursement from another party for losses incurred in connection with the first party's liability to a third party." *Chicago Title Ins. Co. v. Accurate Title Searches, Inc.*, 173 Conn. App. 463, 480 (2017)(internal citation omitted).  "[I]n order to recover under a theory of tortious indemnification, the first tortfeasor, seeking indemnification, must demonstrate that the second tortfeasor's 'active negligence, rather than the [first tortfeasor's] own passive negligence, was the direct, immediate cause' of the harm in question."  *ATC Partn. v. Coats N.A. Consol., Inc.*, 284 Conn. 537, 551-552 (2007); *see also, Smith v. New Haven*, 258 Conn. 56, 66 (2001) (holding that "[t]he presence of two tortfeasors is thus required for a viable claim of indemnification []: one, whose passive negligence resulted in a monetary recovery by the plaintiff; and a second, whose active negligence renders him

liable to the first by way of reimbursement").  "[A] plaintiff must allege and ultimately prove four elements to recover under a common law theory of indemnification:

(1) that the other tortfeasor was negligent;
(2) that his negligence, rather than the plaintiff's, was the direct, immediate cause of the accident and injuries;
(3) that he was in control of the situation to the exclusion of the plaintiff; and
(4) that the plaintiff did not know of such negligence, had no reason to anticipate it, and could reasonably rely on the other tortfeasor not to be negligent.

*Covenant Imaging, LLC v. Viking Rigging & Logistics, Inc.*, No. 3:20-CV-00593 (KAD), 2021 WL 4147991, at *2 (D.Conn. September 13, 2021)(*citing, Kyrtatas  v. Stop & Shop, Inc.*, 205 Conn. 694, 697 (1988)).

## VI.   DISCUSSION

### *The Bankruptcy Related Fee Claim ($88,692.51)*

The record is clear.  After GSO received the Termination Letter from Mr. Jackson, and after asking whether a court order was required but receiving no answer, GSO paid itself $88,692.51 from Mr. Jackson's DIP account.  GSO did not file a fee application seeking approval of the fees pursuant to Bankruptcy Code § 330 as required by the Retention Order and Fed.R.Bankr.P. 2016.  The unauthorized withdrawal of funds from a debtor-in-possession bank account is an affront to the integrity of the bankruptcy process.

In its post-trial brief, GSO argues Mr. Jackson's fee claims must fail because there is no private right of action for a violation of Bankruptcy Code § 330 or Fed.R.Bankr.P. 2016.  This argument ignores the provisions of the Plan providing any claims of the estate vested in Mr. Jackson upon completion of the Plan, or the admitted fact that money was taken from the bankruptcy estate in violation of a court order.  The argument also posits that there is no remedy for the harm, which is not so.[210]

---

[210]      ECF No. 552, pp. 7-8 ("… on the Effective Date, all property of the Estate, all Causes of Action and any property acquired by the Debtor pursuant to the Plan shall vest in the Debtor, free and clear of all Liens, Claims, charges or encumbrances (except for any Liens securing an Allowed Secured Claim).")..

I need not decide whether the standard announced by the Supreme Court in *Taggart v. Lorenzen*, 139 S.Ct. 1795 (2019) for evaluating discharge violations applies more broadly to any violation of a court order. Even if I did apply the Taggart "fair ground" inquiry, the record here establishes there was no fair ground of doubt that the Retention Order required GSO to seek approval for bankruptcy-related fees, GSO knew of this obligation, and yet, withdrew the money without seeking or receiving such approval.

This court has the power and authority to enforce its own Retention Order and to fashion an appropriate remedy. Here, there is an equitable basis to require disgorgement in the amount of $88,692.51, plus attorney's fees, costs and post-judgment interest. GSO and Mr. Oppenheim knowingly ignored a clear order of the bankruptcy court. Mr. Oppenheim acknowledged he knew a court order was required before GSO could be paid from the DIP account and that he did not seek such an order because he feared he would not be paid if he waited. The knowing and unauthorized withdrawal of funds from a DIP account must be remedied by disgorgement.

GSO's defenses are without merit. GSO asserts it should be entitled to retain the fee because it performed services requested by Mr. Jackson at rates Mr. Jackson accepted. GSO fails to cite any authority for the proposition that professionals retained under Bankruptcy Code § 327 may disregard the court's order and clear provisions of the Bankruptcy Code and Rules and still receive compensation. It is not now relevant whether Mr. Jackson or his estate benefited from these services or whether the fees were reasonable, because without a proper – and timely – application the court cannot review the reasonableness of the fees. GSO failed to file a timely fee application and there is no basis for the court to undertake such an analysis now.

47

In addition to disgorgement, attorney's fees will be awarded to the Plaintiff.  The Debtor here – as the owner of the claim against GSO under the terms of the Plan – should not bear the burden of attorney's fees to pursue disgorgement.  There was no reasonable justification for GSO's unauthorized withdrawal of $88,692.51 from the DIP account.  Because GSO did not pay the money back when it was first raised by Mr. Jackson's counsel in February of 2016 and did not take any other reasonable step to resolve the admittedly unauthorized withdrawal from the DIP account, the Plaintiff was forced to spend time and money pursuing disgorgement.  Many bankruptcy estates, debtors, trustees and creditors would not have the resources to pursue similar violations, leaving them vulnerable to abuses of court orders and the professional compensation process contemplated by Bankruptcy Code § 330 and Fed.R.Bankr.P. 2016.  To order mere disgorgement here without providing a mechanism to make a plaintiff or movant truly whole – to compensate for the real-world cost to hire counsel to force compliance with the  Retention Order and the well-known requirements of Bankruptcy Code § 330 and Fed.R.Bankr.P. 2016 – would create troubling precedent and leave future debtors, trustees and creditors without a remedy in the face of unauthorized withdrawals of estate funds to pay professional fees that were neither reviewed nor allowed.  Pursuant to Bankruptcy Code § 105(a), the court will order attorney's fees as to this portion of the Plaintiff's claims.

### The $90,000 Monthly Fee Claim

Mr. Jackson's argument for disgorgement of $90,000 – consisting of the $30,000 Monthly Fee payments for the months of August, September, and October 2015 – fails for several reasons.

First, the money was withdrawn from a non-debtor account in the name of G-Unit Records, a non-party.  Any harm stemming from GSO's receipt of the $90,000 flows to the payor or to the Jackson-related entity that received GSO's services.  Plaintiff's counsel glosses over the fact that Mr. Jackson and G-Unit Records are separate legal entities, having not advanced any veil-piercing theory.  Mr. Jackson's ownership of G-Unit Records is not enough to vest him with standing to advance claims owned by, and owing to, the corporation.

As discussed during the Retention Hearing in August 2015, the Debtor proposed, and the creditors then appearing and the United States Trustee agreed, G-Unit Records would continue to pay GSO $30,000 each month *outside of the bankruptcy process* for work that was not related to the Chapter 11 case.  Attorney Neligan explained the request from the major stakeholders in the case was premised on the scope of services provided by GSO to Mr. Jackson and – importantly – to the Jackson-related entities.

> The work that [GSO is] doing for the companies – each have their own separate creditors and, you know, are separate from Mr. Jackson – will continue, you know, because those companies, other than SMS Promotions, are not in bankruptcy.[211]

Counsel for Sleek Audio represented the same understanding, "[a]nd whatever they're doing for companies that are not in bankruptcy, you know, they can do.  They're not constrained by the provisions of the bankruptcy code from doing that to my way of thinking."[212]  I find it inconsistent for Mr. Jackson's counsel here to take a position in direct conflict with Mr. Jackson's counsel's representations to the court in 2015.  G-Unit Records was not in bankruptcy.  G-Unit Records was not bound by the provisions of the Bankruptcy Code requiring it, among other things, to list its creditors, disclose its financial affairs, file

---

[211]    ECF No. 938, p. 42, L. 7-16.
[212]    ECF No. 938, p. 42, L. 21-25, p. 43, L. 1-5.

monthly operating reports, or to seek court approval to employ and then to pay its professionals.

Counsel has not provided a rationale by which the court may or should disregard the corporate entity.  Assuming the court might order disgorgement of the $90,000 paid from the G-Unit Records account, it is unclear under what authority the court would order payment be made to the individual plaintiff here rather than to the corporation.  In any event, the corporation is not a party to this adversary proceeding and the court is without authority to grant disgorgement of the $90,000 paid by the corporation to GSO.

Second, counsel appears to assume the court needed to waive bankruptcy requirements for GSO vis-à-vis the Jackson-related entities.  But, the Jackson-related entities did not have an obligation to obtain bankruptcy court approval for the retention and compensation of their professionals.  The Debtor's counsel made clear during the Retention Hearing that GSO would wear two hats – one as a professional for the non-debtor Jackson-related entities and one as a professional employed in the bankruptcy case for the bankruptcy Debtor.  There would be two payment processes to match these two roles.  For the Debtor Mr. Jackson, the Debtor's professionals would only be paid after application and allowance of their fees pursuant to Bankruptcy Code § 330.  For the non-debtor Jackson-related entities, Mr. Jackson and the major stakeholders in the case understood the fee payment process would be handled outside of the bankruptcy court.  There was a common-sense reason for this:  the Jackson-related entities were not bankruptcy debtors, and the provisions of the Bankruptcy Code and Rules did not apply to them.  This was discussed during the Retention Hearing.

A substantial part of the Debtor's argument is premised on differences between the original proposed order attached to the Retention Application that contained a specific

waiver of the requirement to seek court approval for the $30,000 Monthly Fees and the Retention Order signed by the court which was silent as to such a waiver. *See*, AP-ECF No. 354, p. 8. Counsel argues the omission in the Retention Order meant GSO was required to apply for approval of the $30,000 Monthly Fees, without acknowledging the opposite is true: *Bankruptcy Code § 330 did not apply and no waiver was required.* In other words, the Retention Order did not need to waive a requirement to comply with the Bankruptcy Code because that requirement did not exist.

Finally, Mr. Jackson failed to show how he – individually, or, as a former debtor or debtor-in-possession – suffered any harm when G-Unit Records paid GSO. If GSO's services provided to the Jackson-related entities were performed poorly or outside the scope of what was requested, then the payor or client – neither of which is Mr. Jackson – might have a claim against GSO. Even if such a claim was before the court, the Plaintiff has not established GSO acted improperly in rendering services to G-Unit Records or the other Jackson-related entities during August, September and October 2015. There was no evidence presented that GSO performed any services for Mr. Jackson individually for the months of August or September 2015, or that any such services were compensated by the $30,000 Monthly Fees for those months. Mr. Jackson's post-trial brief assumes GSO performed services for Mr. Jackson individually in August and September 2015, without citing to evidence. *See*, AP-ECF No. 354, p. 12.

For October 2015, Mr. Jackson argues Mr. Oppenheim's testimony regarding tax services being billed as part of the $30,000 Monthly Fee is evidence GSO provided services to Mr. Jackson individually and failed to seek court approval for those fees.

Q      Who was billed for the foundation return?

A       Nobody. We didn't bill anybody for any tax work. We just included it --
        even though our agreement said we could bill separately for the tax
        work, we waived all fees on any tax return we ever did for 50.[213]

Q       You never provided any invoices for the month of October to the
        Neligan firm?
A       For the bankruptcy we did, yes. Not for Curtis himself. There is a
        difference. His personal tax return was not to do with the bankruptcy.

Q       Are you aware that my client, Curtis Jackson, filed for Chapter 11 as an
        individual?
A       Yes.

Q       Is it your testimony that his individual tax return had no relevance to the
        bankruptcy court?
A       I'm testifying that we did not bill his – the bankruptcy court for the tax
        work done for Curtis Jackson.
Q       That's what I'm saying.[214]

In October 2015, GSO completed and filed Mr. Jackson's tax returns for the 2014

tax year.[215]  While it is clear someone at GSO rendered services regarding Mr. Jackson's

individual tax returns in October 2015, there is no evidence Mr. Jackson or the bankruptcy

estate (via the debtor-in-possession account) paid GSO for that work.[216]    Mr.

Oppenheim's testimony that the tax services were provided to Mr. Jackson without charge

is unrebutted.  Nothing in the record demonstrates what services were provided to the

Jackson-related entities in October 2015 or what percentage of the services provided in

October 2015 related to Mr. Jackson's tax return compared to services provided to the

Jackson-related entities.

For these reasons, Mr. Jackson's claim seeking recovery of the $90,000 paid by

G-Unit Records to GSO fails.

---

[213]    AP-ECF No. 339, p. 211, L. 11-15.
[214]    AP-ECF No. 339, p. 157, L. 8-20.
[215]    AP-ECF No. 337, p. 216, L 15-22, p. 217, L. 1-13.
[216]    AP-ECF No. 354, p. 19.

### *The IRC § 1398 Claim*

Mr. Jackson asserts GSO is liable for the $174,156 of 2015 tax liability Mr. Jackson incurred due to GSO's malpractice in failing to advise – and make – the IRC § 1398 election.  The first two elements required to establish a professional negligence or malpractice claim – duty and breach -- are clear from the record and established.

### *GSO's Duty to Mr. Jackson*

First, there is no doubt GSO owed Mr. Jackson a duty.  GSO admits it owed Mr. Jackson a duty and acted as a fiduciary.[217]   Additionally, GSO's assumption of responsibility for all of Mr. Jackson's day-to-day finances, management of his assets and annual preparation of tax returns and tax return information placed GSO in a fiduciary relationship with Mr. Jackson.  *Compare, Iacurci v. Sax*, 139 Conn. App. 386, 405 (2012)(concluding an accountant hired to prepare annual tax returns did not owe a fiduciary duty to client where there was no evidence the accountant was hired to manage the client's funds, advise the client with respect to or recommend financial transactions).  Mr. Sprishen's testimony is persuasive that an accountant has an on-going duty to apprise a client of tax elections and tax developments affecting a client's overall tax liability.

Based on this record, I have little difficulty concluding GSO owed Mr. Jackson a duty of care required GSO:

- To timely determine the tax attributes of the individual Chapter 11 debtor and of the Chapter 11 debtor-in-possession;

- To evaluate the Chapter 11 debtor's individual tax attributes from the tax year preceding the year in which the Chapter 11 case commenced, and the individual's tax attributes as they existed on the Petition Date,

- To evaluate the consequence to the individual and to the Chapter 11 debtor-in-possession of making or not making a timely IRC § 1398 election;

---

[217]    AP-ECF No. 337, p. 231, L. 9-13; AP-ECF No. 338, p. 131, L. 21-24, p. 134, L. 24-25, p. 153, L. 1.

- To advise the debtor, here Mr. Jackson, about the financial consequences to himself and to the Chapter 11 bankruptcy estate if the short-year tax election was made or not made, and to advise of the firm deadline in IRC § 1398 to make the election; and

- If, after being advised, Mr. Jackson chose to make the short-year tax election, to timely file the IRC § 1398 election.

Notably, other professionals may have had these duties in addition to GSO.  Mr. Jackson's Chapter 11 bankruptcy case was one with numerous professionals employed to represent him as a debtor and debtor-in-possession.  The Chapter 11 Plan proposed by Mr. Jackson exculpated and released all Chapter 11 professionals except GSO.[218]

### *GSO Breached a Duty*

GSO breached its duty to Mr. Jackson because it did not advise him of the option to make the IRC § 1398 short-year tax election and that the firm deadline for the election was November 16, 2015.

After the October 13, 2015 letter, however, GSO's responsibility for evaluating the tax ramifications and authority to make elections on behalf of Mr. Jackson terminated.  If Mr. Jackson had not terminated GSO's employment at that time, GSO would have had time to fulfill its other duties owed to Mr. Jackson, including to timely determine the tax attributes of the individual Chapter 11 debtor and of the Chapter 11 debtor-in-possession, to evaluate the Chapter 11 debtor's individual tax attributes from the tax year preceding the year in which the Chapter 11 case commenced, and the individual's tax attributes as they existed on the Petition Date, and to evaluate the consequence to the individual and to the Chapter 11 debtor-in-possession of making or not making a timely IRC § 1398 election.

---

[218]    ECF No. 485, p. 43, § 13-12.

While I agree with Mr. Sprishen's testimony that a "best practice" would have been for GSO to inform the successor firm, Boulevard, about the deadline, there was no duty to do so.  Moreover, notifying the successor firm would not have discharged GSO's duty to inform the client – Mr. Jackson.  Therefore, the only duty regarding the short-year tax election GSO breached its duty to advise and inform Mr. Jackson of his option to make the short-year tax election and the firm deadline to do so.

### *Causation and Damages*

This brings us to the third and fourth elements of Mr. Jackson's malpractice claim: causation and damages.  Mr. Jackson relies on Mr. Bozick's testimony and Form 8879 (a procedural form used to file a tax return, not the tax return itself) indicating Mr. Jackson owed $174,156 in federal income taxes, including late penalties and interest, for the tax year 2015 to prove he has sustained damages resulting from GSO's negligence.  Mr. Bozick testified without elaboration that if GSO had made the IRC § 1398 election, Mr. Jackson would not have had any 2015 tax liability.[219]

But, there are problems with Mr. Bozick's testimony.  First, he was not offered as an expert witness and he has no experience with IRC § 1398 elections.[220]  Second, Mr. Bozick provided no factual basis for his opinion that the entire tax liability for a given period of time could have been avoided.  He did not testify he (or anyone else at Boulevard) conducted any analysis of what the tax liability would have been with the election made versus not made.  He did not testify as to the amount of net operating loss carryovers that existed at the end of the 2014 tax year, or any of Mr. Jackson's 2015 pre-petition or 2015 post-petition income characteristics.  Rather his unsubstantiated opinion

---

[219]    AP-ECF No. 341, p. 212, L. 11-13.
[220]    AP-ECF No. 341, p. 179, L. 15-23, p. 188, L. 13-17, p. 189, L. 8-13.

that the entire tax liability could have been avoided appears to stem from what he learned from Boulevard's tax director, Mike Feinstein, who did not testify.    Mr. Bozick's unsupported opinion is not competent evidence of damages, and his testimony is not credible that if the election had been made, Mr. Jackson's tax liability for a 2015 short-year would have been zero.

Besides Mr. Bozick's one sentence opinion, Mr. Jackson failed to present any other evidence demonstrating how his tax liability would have been less if he had made the IRC § 1398 election.  The deficiencies in the evidence offered in support of damages include:

- A failure to offer Mr. Jackson's 2015 Form 1040 detailing Mr. Jackson's tax liability and net loss carryover claims;
- A failure to specify the amount of the 2014 net operating loss carryovers;
- A lack of any analysis or evidence of the income Mr. Jackson generated during the pre-petition period of 2015 that would impact the consideration of making the election and whether any such income could be offset by net operating loss carryovers; and
- A lack of any information regarding whether an alternative minimum tax liability would have been incurred as a result of making the IRC § 1398 election.

No other evidence supports a conclusion that Mr. Jackson was harmed *but for* GSO's failure to make the short-year election.  Instead, there is evidence that Mr. Jackson and his bankruptcy estate (a separate taxpayer) subsequently used those (unspecified) net operating loss carryovers to advantageously reduce their tax liabilities.  Again, no party presented evidence as to the amount of the 2014 net operating loss carryovers, or how they were specifically used to reduce either the bankruptcy estate's or Mr. Jackson's tax liability following the Petition Date.  Two simple questions remain:  Was it more or less beneficial for Mr. Jackson to use existing net operating loss carryovers against income in the period January 1, 2015 through July 12, 2015?  And, was it more or less beneficial for Mr. Jackson's bankruptcy estate to use existing net operating loss carryovers against calendar year 2015 income, with any residual net operating loss carryovers revesting in

Mr. Jackson upon the Effective Date of the Plan?  This is a math problem, but the plaintiff failed to provide the court with the numbers.

In sweeping broad terms, the plaintiff argues the evidence suggests it would have been more beneficial for Mr. Jackson to have made the short-year election in 2015.  Such a generalization – that it is better to save money earlier – is likely true for almost all debtors, and most people, generally.  However, it is not specific enough to form the basis of a damages award.  Mr. Jackson failed to show that he paid more tax overall including in subsequent years because the short-year election under IRC § 1398 was not made.  No specific dollar amount quantifying the harm to Mr. Jackson was presented beyond the amount stated on Form 8879.

The lack of evidence implicates both the causation and damages elements of negligence.  Even if I concluded GSO's failure to make the IRC § 1398 election may have been a substantial factor in causing Mr. Jackson to owe 2105 taxes, I am unable to conclude it was the "but for" cause of Mr. Jackson owing $165,848 in taxes, because there is no competent evidence of what his tax situation would have been if the election had been made.  The deficiency in the evidence leaves the court unable to calculate Mr. Jackson's damages with any degree of certainty.  Accordingly, Mr. Jackson's negligence claim against GSO must fail.

### Other Claims of Malpractice

Mr. Jackson made various additional claims that GSO committed malpractice during the course of their retention including failing to conserve his assets post-petition, failing to advise Boulevard of impending deadlines, and failing to turn over Mr. Jackson's records to Boulevard in a timely fashion.  None of these claims have merit.

The court cannot conclude GSO had a duty to advise Boulevard of impending deadlines and the evidence does not support a conclusion that GSO breached its duty under applicable ethical codes to turn over Mr. Jackson's records in a timely fashion to Boulevard.

As to failing to conserve Mr. Jackson's assets post-petition, the evidence is sporadic, inconsequential, and lacking specificity as to any direct harm.

### GSO's Claim for Indemnification from Boulevard

Because Mr. Jackson's malpractice and negligence claims against GSO fail, GSO's claim for indemnification from Boulevard also fails. There are no damages to indemnify. Even if the court reached the question of Boulevard's obligation to indemnify GSO, the claim would fail. Indemnification requires – among other elements – proof Boulevard controlled the situation to the exclusion of GSO and proof Boulevard's negligence rather than GSO's was the direct and immediate cause of the IRC § 1398 election not being made. The record developed at trial fails to support any of these conclusions. Mr. Kolbrenner's (GSO's expert) testimony regarding IRC § 1398 was of no value given his lack of experience or expertise regarding IRC § 1398.

While I can conclude Boulevard owed a duty to Mr. Jackson similar to GSO's duty to Mr. Jackson and should have conducted its own due diligence of impending deadlines before taking on a client in bankruptcy, I cannot conclude Boulevard controlled the IRC § 1398 election to the exclusion of GSO. The record developed at trial shows the transition of Mr. Jackson's financial information and responsibility was disorderly, without clear ending and commencement dates for different tasks. Because the record does not support the determination that Boulevard's negligence (if any) was the direct cause of the

missed opportunity to make the short-year tax election, I cannot conclude GSO would be entitled to indemnification from Boulevard.

## VII.    CONCLUSION

It could be said, everything, in retrospect, is obvious.  Upon deciding to file bankruptcy, Mr. Jackson should not have retained GSO as the accountants for the debtor and debtor in possession in the Chapter 11 case.  Upon the news of the bankruptcy filing, Mr. Oppenheim and the other professionals at GSO showed no curiosity about what special rules might apply to their lucrative client or to themselves as professionals retained under provisions of the Bankruptcy Code.  Like GSO, Boulevard should have learned about bankruptcy law and its interaction with the Internal Revenue Code when an individual files a Chapter 11 case and focused on obtaining information about pre-petition tax attributes of its new client with a greater sense of urgency.

For the Bankruptcy Related Fee Claim, GSO must disgorge the $88,692.51 it paid itself without applying for or obtaining a court order to Mr. Jackson as the post-Chapter 11 Plan owner of the estate's claims.  Mr. Jackson is also awarded attorneys' fees, costs and post-judgment interest related to this claim in an amount to be determined.

No relief can be granted for the $90,000 Monthly Fee Claim as explained in this Memorandum of Decision.

With regard to IRC § 1398 Claim for negligence and malpractice, no relief can be awarded because the Plaintiff failed to meet its burden to establish all required elements. Because I cannot conclude GSO is liable on the negligence or malpractice claim to Mr. Jackson, Boulevard is not required to indemnify GSO.

For the absence of doubt, this decision will result in a judgment against GSO and not the individual defendants named in the complaint.  Mr. Jackson failed to present

evidence of improper conduct by GSO individual members: Jonathan Schwartz, Bernard Gudvi, Nicholas Brown, and William Braunstein. No evidence was submitted regarding Messrs. Gudvi, Brown or Braunstein. Mr. Jackson admits these GSO members, along with Michael Oppenheim, were named because they were members of GSO – a limited liability company. There was no evidence funds from the DIP account or the G-Unit Records, Inc. account were paid to anyone other than GSO.

The court has considered all other arguments and finds them to be without merit.

While the amount of attorney's fees and costs to be awarded will be established in a further order of the court, this is a final order on the merits of the disputes, including the $90,000 Monthly Fee Claim, the Bankruptcy Related Fee Claim and the IRC § 1398 Claim. "[T]he pendency of a ruling on an award for fees and costs does not prevent, as a general rule, the merits judgment from becoming final for purposes of appeal." *Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Engineers & Participating Employers*, 571 U.S. 177, 179 (2014). The time within which a party may file an appeal of a final order of the bankruptcy court is fourteen (14) days after it is entered on the docket. *See*, Fed.R.Bankr.P. 8002(a)(1).

Accordingly, it is hereby

ORDERED: GSO Business Management, LLC motion for judgment, AP-ECF No. 352, is GRANTED IN PART and DENIED IN PART as set forth herein; and it is further

ORDERED: Curtis James Jackson, III motion for judgment as to GSO Business Management, LLC's affirmative defenses (presented as a memorandum of law), AP-ECF No. 354, is GRANTED IN PART and DENIED IN PART as set forth herein; and it is further

ORDERED: Judgment will enter in favor of Curtis James Jackson, III against GSO Business Management, LLC as to the claim for disgorgement of the sum of $88,692.51,

plus post-judgment interest, and GSO Business Management, LLC shall disgorge said sum to Mr. Jackson on or before September 30, 2022; and it is further

ORDERED:  In addition to a judgment requiring disgorgement of the sum of $88,692.51, plus post-judgment interest, said judgment shall also require GSO Business Management, LLC to pay attorney's fees, costs and any post-petition interest accruing on and after October 1, 2022, to Curtis James Jackson, III in an amount to be determined; and it is further

ORDERED: Counsel for Curtis James Jackson, III shall file a statement of its attorney's fees and costs associated with pursuing disgorgement of the $88,692.51, only, on or before September 30, 2022; and it is further

ORDERED:  Any response or objection by GSO Business Management, LLC to the statement of attorney's fees and costs filed by the Plaintiff shall be filed on or before October 21, 2022; and it is further

ORDERED: Judgment will enter against Curtis James Jackson, III as to the claims for disgorgement of $90,000 that GSO Business Management, LLC withdrew from G-Unit Records Inc.'s account; and it is further

ORDERED: Judgment will enter against Curtis James Jackson, III on his claim for professional malpractice by GSO Business Management, LLC for failure to advise and make a short-year election pursuant to 26 United States Code § 1398; and it is further

ORDERED: Judgment will enter against GSO Business Management, LLC and in favor of Boulevard Management, Inc. as to the third-party complaint, AP-ECF No. 21; and it is further

ORDERED: Judgment will enter against Curtis James Jackson, III and in favor of the individual members of GSO Business Management, LLC named in the complaint, AP-

ECF No. 1, including Jonathan Schwartz, Michael Oppenheim, Bernard Gudvi, Nicholas Brown and William Braunstein; and it is further

ORDERED:  The Clerk is requested to hold this adversary proceeding case open after the entry of a Judgment for the determination of attorney's fees and costs to be awarded to the Plaintiff on the Bankruptcy Related Fee Claim.

Dated this 29th day of August, 2022, at New Haven, Connecticut.



Ann M. Nevins
Chief United States Bankruptcy Judge
District of Connecticut